# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLORADO

**Civil Action No.: 1:26-cv-01917**

**UNIFIED GROWTH, INC.**, a Colorado corporation; **GONZY LIMITED**, a Colorado limited liability company; **AD DEPOT LLC**, a Colorado limited liability company; and **DANELLE OSBORNE**, an individual,

> Plaintiffs,

v.

**FATTMERCHANT, INC., d/b/a STAX PAYMENTS**, a Delaware corporation; **WORLDPAY ISO INC.**, a Nebraska corporation; and **FIFTH THIRD BANK, NATIONAL ASSOCIATION**, a national banking association with its main office in Cincinnati, Ohio,

> Defendants.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiffs Unified Growth, Inc., Gonzy Limited, Ad Depot LLC, and Danelle Osborne, by and through undersigned counsel, for their complaint against Defendants Fattmerchant, Inc. d/b/a Stax Payments, Worldpay ISO Inc., and Fifth Third Bank, National Association, allege as follows:

## THE PARTIES

1. Plaintiff Unified Growth, Inc. ("**Unified Growth**") is a corporation organized and existing under the laws of the State of Colorado with its principal place of business

located in Colorado Springs, Colorado. Unified Growth is a citizen of Colorado for diversity jurisdiction purposes.

2.  Plaintiff Gonzy Limited ("**Gonzy**") is a limited liability company organized and existing under the laws of the State of Colorado with its principal place of business located in Colorado Springs, Colorado. Ms. Danelle Osborne is the sole member of Gonzy. Ms. Osborne is a citizen of the State of Colorado. Gonzy is therefore a citizen of Colorado for diversity jurisdiction purposes. Gonzy Limited is a separate legal entity from Unified Growth, Inc., with its own independent business operations and merchant processing relationships.

3.  Plaintiff Ad Depot LLC ("**Ad Depot**") is a limited liability company organized and existing under the laws of the State of Colorado with its principal place of business located in Colorado Springs, Colorado. Ms. Danelle Osborne is the sole member of Ad Depot. Ms. Osborne is a citizen of the State of Colorado. Ad Depot is therefore a citizen of Colorado for diversity jurisdiction purposes. Ad Depot LLC is a separate legal entity from Unified Growth, Inc., with its own independent business operations and merchant processing relationships.

4.  Plaintiff Unified Growth, Inc. is a Colorado corporation with its principal place of business currently located at 14860 Roller Coaster Rd, Colorado Springs, Colorado 80921. At the time the Merchant Processing Agreement was executed on September 4, 2019, Unified Growth's business location was at 20 Langley Place, Colorado Springs, Colorado 80906. Unified Growth is a digital services company that relies on credit card processing for its business operations.

5.  Ms. Osborne was the primary point of contact with Defendants throughout the six-year relationship and has personal knowledge of all communications and events described in this Complaint. Where facts are stated herein, they are based on Ms. Osborne's personal knowledge, business records maintained by Unified Growth, or communications with Defendants.

6.  Defendant Fattmerchant, Inc., doing business as Stax Payments ("**Stax**"), is, upon information and belief, a Delaware corporation with its principal place of business

located at 618 E South Street, #510, Orlando, Florida 32801. Stax is a citizen of Delaware and Florida for diversity jurisdiction purposes. Stax is a payment processor that provided merchant services to Plaintiffs.

7.  Defendant Worldpay ISO Inc. (**"Worldpay"**) is a Nebraska corporation with its principal place of business located at 8500 Governors Hill Dr, Cincinnati, Ohio 45249. Worldpay is a citizen of Nebraska and Ohio for diversity jurisdiction purposes. Worldpay is a payment processor and acquiring bank processor that provided merchant acquiring services in connection with Plaintiffs' merchant account. Worldpay ISO Inc. is the "Processor" as defined in the Merchant Processing Agreement **(Exhibit 20A)** and is identified as "NPC" (National Processing Company) throughout the contract documents. Worldpay ISO Inc. is a registered Independent Sales Organization (ISO) of Fifth Third Bank.

8.  Defendant Fifth Third Bank, National Association (**"Fifth Third"**) is, upon information and belief, a national banking association with its main office located at 38 Fountain Square Plaza, Cincinnati, Ohio 45263. Under *Wachovia Bank v. Schmidt*, 546 U.S. 303 (2006), Fifth Third is a citizen of Ohio for diversity jurisdiction purposes. Fifth Third is the acquiring bank and sponsor bank for Plaintiffs' merchant account and is a member of the Mastercard payment card network.

## JURISDICTION

9.  This Court has subject matter jurisdiction over this action pursuant to:

    a.  **28 U.S.C. § 1331** (federal question), because Plaintiffs assert claims arising under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 et seq., and the Fair Credit Reporting Act, 15 U.S.C. §§ 1681 et seq.;

    b.  **28 U.S.C. § 1332(a)** (diversity), because there is complete diversity of citizenship between Plaintiffs (all Colorado citizens) and Defendants (citizens of Delaware and Florida, Nebraska and Ohio, and Ohio, respectively), and the amount in controversy exceeds $75,000, exclusive of interest and costs;

c.     **28 U.S.C. § 1367(a)** (supplemental jurisdiction) over all remaining state-law claims, which arise from the same case or controversy as the federal claims; and

d.     **28 U.S.C. § 2201** (Declaratory Judgment Act), with respect to the declaratory relief sought regarding the arbitration provision and limitation of liability provisions contained in the 34-Page Terms.

10.    This Court has the authority to exercise nationwide service of process over each Defendant in connection with the civil RICO claims pursuant to 18 U.S.C. § 1965(b) and (d).

11.    All Plaintiffs are citizens of Colorado. Defendant Stax is a citizen of Delaware and Florida. Defendant Worldpay is a citizen of Nebraska and Ohio. Defendant Fifth Third is a citizen of Ohio. There is complete diversity of citizenship.

12.    The amount in controversy exceeds $75,000, exclusive of interest and costs, based on Plaintiffs' compensatory damages.

13.    **Personal Jurisdiction Over Stax.** This Court has personal jurisdiction over Defendant Stax because Stax purposefully directed its activities toward Colorado and the claims arise out of Stax's contacts with Colorado. On September 4, 2019, Stax, doing business as Fattmerchant, signed the Merchant Processing Agreement with Unified Growth, Inc., a Colorado corporation, as the "Sales Organization" and registered ISO/MSP of Fifth Third Bank **(Exhibit 20)**. From September 2019 through November 2025, Stax acted as the Independent Sales Organization (ISO) and Member Service Provider (MSP) for Unified Growth's merchant account, serving as the primary point of contact for all account management, customer service, technical support, risk reviews, and account administration. Stax regularly communicated with Plaintiffs in Colorado via email, telephone, and video conference. Stax knew that Unified Growth was a Colorado corporation and that its conduct would cause harm in Colorado.

14.    Stax purposefully directed its activities toward Colorado by acting as the "ISO" and "Agent" for the Member Bank, and by serving as the primary point of contact for a Colorado merchant, including sending misrepresentations into Colorado that induced reliance by a Colorado business. **(Exhibit 20)**

15.    **Personal Jurisdiction Over Worldpay.** This Court has personal jurisdiction over Defendant Worldpay because Worldpay purposefully directed its activities toward Colorado and the claims arise out of Worldpay's contacts with Colorado. On September 4, 2019, Worldpay ISO Inc. entered into a Merchant Processing Agreement with Unified Growth, Inc., a Colorado corporation **(Exhibits 20 and 20A)**. Worldpay is the primary contracting party identified as the "Processor" throughout the thirty-four-page Terms and Conditions. From September 2019 through November 2025, Worldpay processed millions of dollars in credit card transactions for Unified Growth's Colorado operations and received substantial economic benefit. Worldpay conducted risk reviews of Unified Growth's merchant account through Kennedy Usoro, a Credit Risk Analyst who communicated directly with Ms. Osborne in Colorado **(Exhibits 5A, 5B)**. Worldpay imposed a $394,538.19 funding hold on Unified Growth's account in June-July 2025, terminated the merchant account on November 20, 2025 **(Exhibit 14)**, and participated in the December 4, 2025 MATCH placement.

16.    Worldpay purposefully directed its activities toward Colorado by acting as the "Processor" and "Agent" for the Member Bank in connection with a Colorado merchant, and by conducting multiple risk reviews and imposing funding holds that directly impacted a Colorado business and its Colorado-based principal. **(Exhibit 20)**

17.    This Court has personal jurisdiction over Defendant Fifth Third Bank, N.A. ("Fifth Third") because Fifth Third is a direct party to the Merchant Processing Agreement with Plaintiffs and purposefully directed its activities toward Colorado, establishing sufficient minimum contacts with the state such that the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice. Specifically:

a.    **Fifth Third is a direct party to the Merchant Processing Agreement.** The footer of every page of the 6-Page Agreement **(Exhibit 20)** identifies Fifth Third as the principal and Worldpay and Stax as its registered ISOs. Section 3 of the Agreement explicitly identifies Fifth Third as the "MEMBER BANK" party to the agreement. Sections 10, 11, and 12 of the Agreement grant Fifth Third specific rights and impose specific obligations, confirming its status as a party to the contract.

b. **Fifth Third purposefully availed itself of the privilege of conducting business in Colorado.** By entering into this contract with Plaintiffs, who Fifth Third knew were Colorado residents and corporations, Fifth Third purposefully availed itself of the privilege of conducting business in Colorado and invoked the benefits and protections of its laws.

c. **Fifth Third purposefully reached into Colorado to exercise its contractual rights against Plaintiffs.** Fifth Third purposefully reached into Colorado to create a six-year contractual relationship, process millions of dollars in Colorado transactions, and exercise its contractual rights against Colorado residents and corporations, including conducting risk reviews of Plaintiffs' account (through its agent Worldpay), imposing a $394.538.19 funding hold on Plaintiffs' Colorado bank account, making the decision to terminate Plaintiffs' merchant account, submitting the MATCH placement to Mastercard on December 4, 2025, and reversing the MATCH placement on December 12, 2025 (demonstrating Fifth Third's direct control over MATCH decisions).

d. Over the six-year relationship (September 2019 to November 2025), Fifth Third processed approximately $25 million in transactions for Plaintiffs' Colorado business, earning approximately $500,000 in processing fees and interchange revenue, thereby deriving substantial economic benefit from its activities in Colorado.

e. **Fifth Third's actions were expressly aimed at Colorado.** Fifth Third's contacts with Colorado were not random, fortuitous, or attenuated. They were continuous, systematic, and substantial.

f. **It is fair and reasonable to require Fifth Third to defend itself in Colorado.** Colorado has a strong interest in providing a forum for its residents to seek redress for injuries suffered in Colorado.

18. **Fifth Third Bank, as the "Member Bank" and "Principal" to the 6-Page Agreement,** purposefully directed its activities toward Colorado by: (a) entering into a long-term contractual relationship with a Colorado-based merchant (Unified Growth); (b) assuming direct responsibility for providing settlement funds to a Colorado merchant;

and (c) authorizing its agents (Worldpay and Stax) to solicit and manage business in Colorado on its behalf. **(Exhibit 20)**

## VENUE

19.    Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district, including: (a) execution of the Merchant Processing Agreement from Colorado Springs; (b) Defendants' false statements made to Plaintiffs in Colorado; (c) Plaintiffs' performance of their obligations from Colorado Springs throughout the six-year relationship; (d) the harm from Defendants' conduct suffered in Colorado; and (e) location of all three Plaintiff entities in Colorado.

19A.    For claims arising under 18 U.S.C. §§ 1961-1968, venue is also proper in this district under 18 U.S.C. § 1965(a), because each Defendant transacted affairs of the enterprise in this district by soliciting, contracting with, processing transactions for, and communicating with Plaintiffs in Colorado Springs, Colorado throughout the six-year relationship.

20.    All Plaintiffs are located in Colorado Springs, Colorado, within this judicial district.

21.    The Merchant Processing Agreement was executed by Ms. Danelle Osborne, CEO of Unified Growth, from Colorado Springs, Colorado, on September 4, 2019. From September 2019 through November 2025, Unified Growth performed its obligations under the agreement from its Colorado Springs location, processing millions of dollars in credit card transactions and paying substantial processing fees to Defendants.

22.    Throughout the six-year relationship, Defendants regularly communicated with Plaintiffs in Colorado Springs via email, telephone, and video conference regarding account management, bank account updates, risk reviews, funding holds, termination, and MATCH placement.

23.    Defendants imposed two funding holds totaling $394,538.19 on Unified Growth's merchant account, directly affecting Unified Growth's Colorado Springs operations. On November 20, 2025, Defendants terminated Unified Growth's merchant account. On

December 4, 2025, Fifth Third Bank submitted a MATCH placement to Mastercard identifying Ms. Danelle Osborne as a Colorado resident and Unified Growth as a Colorado corporation. Following the MATCH placement, Stripe terminated the merchant accounts of Gonzy Limited and Ad Depot LLC on December 4 and 6, 2025, respectively, citing the MATCH listing as the reason for termination **(Exhibits 16, 17)**.

24.     All of the harm suffered by Plaintiffs was suffered in Colorado Springs, where Plaintiffs are located and where Plaintiffs operate their businesses.

## FACTS COMMON TO ALL COUNTS

### *A. The Parties*

25.     Plaintiff Unified Growth Inc. ("Unified Growth") is a corporation that was engaged in the business of online marketing and e-commerce.

26.     Plaintiff Danelle Osborne is an individual and the Chief Executive Officer and owner of Unified Growth.

27.     Ms. Osborne is also the sole member of Gonzy Limited and Ad Depot LLC.

28.     Joshua Osborne is Ms. Osborne's husband and serves as Chief Operating Officer of Unified Growth. Mr. Osborne participates in daily video conference meetings with Unified Growth's leadership team and internal staff.

29.     From September 2019 through November 2025, Unified Growth maintained a merchant processing account with Defendants that processed between $600,000 and $800,000 in monthly credit card transaction volume.

30.     Defendant Worldpay ISO Inc. ("Worldpay") is a payment processor that provides merchant services.

31.     Defendant Fifth Third Bank ("Fifth Third") is an acquiring bank and a member of the Visa and Mastercard payment card networks.

32.    Defendant Fattmerchant, Inc. d/b/a Stax Payments ("Stax") is an Independent Sales Organization ("ISO") that markets and sells merchant processing services on behalf of acquiring banks and payment processors.

33.    From September 2019 through November 2025, Unified Growth never failed to cover a fee or chargeback owed to Defendants.

### B. The Merchant Agreement and Failure to Disclose Terms

34.    On or about September 4, 2019, Stax solicited Unified Growth to enter into a merchant processing agreement.

35.    During a conference call on that date, a Stax's Authorized Representative presented Ms. Osborne with a six-page document titled "Merchant Processing Agreement" (the "6-Page Agreement"), which featured the Stax and Fattmerchant logos. **(Exhibit 20).**

36.    The 6-Page Agreement included a graphic titled "The Fatt Promise," which represented that the service included "NO CONTRACT," was "month-to-month," had "no strings attached," and was a "completely transparent system." **(Exhibit 20).**

36A.    Cancellation Policy on Page 6 of the 6-Page Agreement. Page 6 of the 6-Page agreement also contained a sperate "Cancellation Policy" representation: "In the application Terms and Conditions, it lists a term of the merchant agreement as 3 years with a cancellation fee as specified on the application. Please note, our Early Deconversion Fee or Early Termination Fee is $0. There is no penalty for termination of service, however we require 30-day written notice before cancellation date." This representation of the Early Termination Fee was "$0" was directly contradicted by Section 7.B of the 34-page Terms, which imposes liquidated damages on early termination equal to the average monthly fees for the three highest-revenue calendar months in the proceeding 12 months, multiplied by the number of months remaining in the term on the Agreement.

37.    The 6-Page Agreement purports to incorporate by reference a separate 34-page document titled "Terms Of Service" (the "34-Page Terms"). **(Exhibit 20A).**

37A.    **The 34-Page Terms identified as version GEN.0718 are the same Terms purportedly incorporated by reference in the 6-Page Agreement,** which also bears the version code

GEN.0718 in Section 12 (Merchant Acknowledgements). The shared GEN.0718 version code ties the two documents together as a single integrated transaction set.

38.     The 34-Page Terms were not attached to, or otherwise included with, the 6-Page Agreement provided to Plaintiffs.

39.     The 34-Page Terms were accessible only through a hyperlink embedded within the 6-Page Agreement.

40.     The 34-Page Terms define "Processor" as "Worldpay ISO Inc. d/b/a National Processing Company." **(Exhibit 20A)**. Throughout this Complaint, references to "Worldpay" refer to Defendant Worldpay ISO Inc., the contracting party and Processor under the Merchant Processing Agreement.

41.     The 6-Page Agreement lists the Member Bank's address as "c/o Worldpay LLC" for correspondence purposes. **(Exhibit 20)**. However, Worldpay ISO Inc., not Worldpay LLC, is the "Processor" and contracting party under the Merchant Processing Agreement. The "c/o Worldpay LLC" designation is merely a mailing address and does not indicate that Worldpay LLC is a party to the agreement.

42.     During the September 4, 2019, conference call, the Stax's Authorized Representative did not direct Plaintiffs to the hyperlink or otherwise advise them to review the 34-Page Terms.

43.     The signing portion of the September 4, 2019, conference call took less than seven minutes.

44.     During the signing process, the Stax's Authorized Representative stated that the agreement was "standard" and emphasized the "NO CONTRACT" representation displayed on the 6-Page Agreement.

45.     During the signing process, the Stax's Authorized Representative did not discuss, mention, or otherwise disclose the existence of an arbitration clause or limitation of liability provision during the conference call.

46.     Plaintiffs did not click the hyperlink and did not review the 34-Page Terms before Ms. Osborne signed the 6-Page Agreement via an electronic signature process during the conference call.

47.     Plaintiffs were not provided with a physical or electronic copy of the 34-Page Terms at the time of signing or at any time thereafter.

48.     The 34-Page Terms contain an arbitration provision at Section 12.L and a limitation of liability provision at Section 9.B.

48A.    **The 34-Page Terms also contain a "right of first refusal" provision in Section 1.B,** which provides: "Prior to exercising any right of termination on non-renewal, you agree that we shall have a right of first refusal before you enter into an agreement with a third party for the Services. Except for term length, you agree that our right includes terms and conditions that are substantially similar to those discussed with the third party." This provision was not disclosed to Plaintiffs at signing.

49.     Plaintiffs were not provided a copy of these provisions and were not aware of their existence at the time of signing.

50.     Between September 4, 2019 and mid December, 2025, Plaintiffs were never provided with the 34-Page Terms and never reviewed them.

50A.    **Two separate DocuSign envelopes.** Pages 1-5 of the 6-Page Agreement (the Merchant Application and Fee Schedule) bear DocuSign Envelope ID E8351CF4-9B44-4340-800A-A2444164718. Page 6 of the 6-Page Agreement (the "fatt PROMISE" graphic and Cancellation Policy) bears a different DocuSign Envelope ID, 9863FA6A-8464-43F4-9E66-1FF0C397B236. The use of two separate DocuSign envelopes confirms that Defendants treated the documents as related but distinct.

50B.    **Limited acknowledgment.** Section 12 of Exhibit 20 (Merchant Acknowledgements and Signature) provides: "Merchant acknowledges that it has reviewed all pages of this Application." The acknowledgment is limited to the Application; it does not state that Plaintiffs reviewed, agreed to, or had access to the 34-Page Terms.

51.     On December 13, 2025, Plaintiffs requested from Stax "a copy of the executed legal contract and any associated agreements that were signed at the inception of our business relationship with STAX/FATTMERCHANT," including "the complete agreement as originally executed, along with any amendments, schedules, or exhibits." **(Exhibit 22)**.

52.     In mid December, 2025, in response to Plaintiffs' request, Stax provided a copy of the 6-Page Agreement. **(Exhibit 23)**. This was the first time Plaintiffs received a copy of the 6-Page Agreement after the September 4, 2019 signing.

53.     The hyperlink to the 34-Page Terms contained in the 6-Page Agreement provided by Stax in mid December, 2025 was non-functional. **(Exhibit 23)**.

54.     Because the hyperlink was non-functional, Plaintiffs were required to use an internet archive service (Wayback Machine) to locate a copy of the 34-Page Terms.

55.     This was the first time Plaintiffs reviewed the complete Terms and Conditions. Upon review with legal counsel, Plaintiffs discovered an arbitration clause requiring binding arbitration in Ohio with cost-sharing provisions, and a limitation of liability clause capping damages at approximately one month's fees.

56.     In mid December, 2025, Plaintiffs asked Stax to clarify whether any contract existed with Worldpay, stating: "we cannot seem to find anything related to Worldpay in this contract that you sent." **(Exhibit 24)**.

57.     On December 19, 2025, Plaintiffs again asked Stax: "ask again about any contract that was or might of been signed with Worldpay. We cannot locate either one of these." **(Exhibit 25)**.

58.     On December 26, 2025, after the November 20, 2025, termination and December 4, 2025, MATCH placement, Meredith Jackson of Stax responded: "The previously provided merchant processing agreement is the only contract you have." **(Exhibit 25)**.

59.     Despite this representation, in the same December 26, 2025, email, Meredith Jackson provided a hyperlink to different terms and conditions dated May 2024. **(Exhibit 25)**. This was the first time Plaintiffs received any notice or copy of terms dated May 2024.

60. The May 2024 terms identified Worldpay (UK) Limited, Worldpay Limited, Worldpay AP Ltd, and Worldpay B.V. as contracting parties, rather than Worldpay ISO Inc. as identified in the September 4, 2019, Merchant Processing Agreement.

61. The May 2024 terms provided that disputes would be governed by English law and resolved in English Courts with exclusive jurisdiction, rather than the arbitration provisions contained in the 34-Page Terms incorporated into the September 4, 2019 agreement.

62. Plaintiffs never received notice of any amendments or new terms between September 4, 2019, and December 26, 2025, as would be required by Section 13.B of the Merchant Processing Agreement.

62A. **Statute of Limitations Tolling and Discovery Rule. Plaintiffs did not receive a copy of the 34-Page Terms, and did not know or have reason to know of the arbitration clause, limitation of liability provision, exclusivity provision, or other onerous provisions contained therein, until mid December 2025, when Stax provided a copy of the 6-Page Agreement and Plaintiffs, having first attempted to use a non-functional hyperlink, obtained the 34-Page Terms through the Wayback Machine internet archive service. Under Colorado's discovery rule, see C.R.S. § 13-80-108 and *Rosane v. Senger*, 149 P.2d 372 (Colo. 1944), and under the doctrine of fraudulent concealment tolling, any statute of limitations applicable to Plaintiffs' claims relating to the formation of the Merchant Processing Agreement, the concealment of the 34-Page Terms, or the fraudulent inducement of the arbitration clause began to run no earlier than mid December 2025. Defendants' active concealment of the 34-Page Terms through the "No Contract" representation, the buried hyperlink, the non-functional hyperlink provided in mid December 2025, and the June 3, 2025 misrepresentation that "all payments are being processed with no problems," tolls any applicable statute of limitations through the commencement of this action.**

## *C. The Arbitration Clause and Its Defects*

63. Section 12.L of the 34-Page Terms is titled "Arbitration, Governing Law, Jury Waiver, and Class Action Waiver."

64. **Section 12.L.i states:** "The parties agree to submit any unresolved dispute, controversy, or claim between them to binding arbitration in lieu of litigation or other court or administrative proceedings."

65. **Section 12.L.i further states:** "Nothing in this Section prohibits a party from applying to a court of competent jurisdiction for a temporary restraining order, preliminary injunction, or other equitable relief."

66. **Section 12.L.ii states:** "Without waiving our right to enforce the Arbitration provisions in this Section, you/Guarantor agree only to bring a legal suit, action, or proceeding arising out of or related to this Agreement or pertaining in any way to the relationship between us and you, or us and Guarantor (an 'Applicable Claim'), in a state or federal court in Hamilton County, Ohio."

67. Section 12.L.i requires disputes to "be resolved by binding arbitration," while Section 12.L.ii requires Plaintiffs to "bring a legal suit, action, or proceeding" in "a state or federal court in Hamilton County, Ohio."

68. The phrase "other equitable relief" in Section 12.L.i is not defined or limited in the agreement.

69. Equitable relief includes, but is not limited to, declaratory relief, permanent injunctions, specific performance, rescission, restitution, constructive trust, disgorgement, and accounting.

70. **Section 12.L.i states:** "The parties shall share the costs, fees, and expenses of the arbitration and the arbitrators equally."

71. Section 12.L.i requires arbitration filings to be made "in Cincinnati, Ohio or Hamilton County, Ohio."

72. Plaintiffs are located in Colorado Springs, Colorado. All events giving rise to this dispute occurred in Colorado.

73. Hamilton County, Ohio is approximately 1,100 miles from Colorado Springs, Colorado.

74. For a case of this magnitude and complexity, the costs, fees, and expenses of arbitration in Hamilton County, Ohio, including arbitrator fees, administrative fees, travel costs, and lodging costs, would exceed $50,000.

75. Section 9.B of the 34-Page Terms is titled "Indemnification and Limitation of Liability."

76. **Section 9.B states:** "Our liability related to or arising out of this Agreement shall not exceed the fees paid to us for the particular Services in question for the calendar month preceding the date of our relevant act or omission."

77. **Section 9.B further states:** "We are not liable for lost profits, lost business, or any incidental, special, consequential, or punitive damages."

78. During the calendar month preceding the November 20, 2025 termination, Unified Growth paid Defendants approximately $5,000 to $10,000 in processing fees.

79. Plaintiffs' actual damages exceed $8,500,000.

80. The limitation of liability in Section 9.B would limit Plaintiffs' maximum recovery to approximately $5,000 to $10,000, even if Plaintiffs prevailed in arbitration.

81. The cost of arbitrating in Hamilton County, Ohio (exceeding $50,000) would exceed the maximum possible recovery under Section 9.B (approximately $5,000 to $10,000).

### D. The Three-Party Relationship and Joint Liability Structure

82. The payment processing services provided to Unified Growth involved a three-party arrangement between Worldpay, Fifth Third, and Stax.

83. The footer on every page of the 6-Page Agreement and the 34-Page Terms states: "Worldpay ISO, Inc ('NPC') is a registered ISO of Fifth Third Bank" and "Fattmerchant is a registered ISO/MSP of Fifth Third Bank." **(Exhibits 20, 20A).**

84. As a registered ISO/MSP of Fifth Third, Stax acted as Fifth Third's agent in soliciting and managing Unified Growth's account.

85. As a registered ISO of Fifth Third, Worldpay acted as Fifth Third's agent in providing payment processing services.

86. Stax also acted as an agent for Worldpay in providing customer service and account management functions to Unified Growth.

87. **Section 12.N of the 34-Page Terms provides:** "You owe Member Bank the same duties and obligations you owe us." **(Exhibit 20A).** This provision makes Fifth Third a co-obligor on the contract, entitled to the same rights and subject to the same duties as Worldpay.

87A. **Anticipated Section 12.N agency disclaimer.** Section 12.N of the 34-Page Terms also includes the following sentence: "The ISO/MSP is an independent contractor and not our agent. Accordingly, ISO has no authority to execute an Agreement on our or Member Bank's behalf." This disclaimer is limited to authority to "execute an Agreement" and does not negate apparent authority for ordinary-course representations and customer service. Apparent authority arises from the principal's manifestations to third parties (Restatement (Third) of Agency § 2.03), independent of the principal-agent contract. For six years, Worldpay and Fifth Third held Stax out as the authorized point of contact for all merchant account communications.

88. **The 6-Page Agreement explicitly lists Fifth Third Bank's "IMPORTANT MEMBER BANK RESPONSIBILITIES," which include:**

   1. being the only entity approved to extend acceptance of Visa products;

   2. being a principal (signer) to the Merchant Agreement;

   3. being responsible for educating Merchants on Operating Regulations;

   4. being responsible for providing settlement funds to the Merchant; and

   5. being responsible for all funds held in reserve. By the plain terms of the Agreement, Fifth Third Bank assumed these non-delegable duties and is directly liable for the breaches of those duties alleged herein.

### E. Concert of Action and Joint Liability

89. Stax, Worldpay, and Fifth Third acted in concert and pursuant to a common plan to terminate Unified Growth's account and place Unified Growth on MATCH.

90.    The decision to place Unified Growth on MATCH was made by "upper management" and involved coordination among all three Defendants.

91.    Each Defendant had knowledge of and participated in the wrongful conduct alleged herein.

92.    Each Defendant benefited from the wrongful conduct by avoiding potential liability for ACH returns and by retaliating against Unified Growth for using multiple processors.

93.    The conduct of each Defendant was a substantial factor in causing Plaintiffs' damages.

94.    Defendants are jointly and severally liable for all damages caused by their concerted wrongful conduct.

### F. The March 2025 Bank Account Update and Stax's Misrepresentation

95.    Prior to March 25, 2025, Plaintiffs' Chase bank account experienced a security breach, requiring Plaintiffs to shift to a new account number at the same institution.

96.    On March 25, 2025, Plaintiffs submitted a request to Stax to update their designated bank account for the deposit of processed funds.

97.    On June 2, 2025, Ms. Osborne emailed Melissa Baar, a manager at Stax, to verify that the bank account update had been completed. **(Exhibit 1)**.

98.    On June 3, 2025, Ms. Baar responded by email, stating: "Yes, it looks like all payments are being processed with no problems." **(Exhibit 2)**.

99.    At the time Ms. Baar made this statement, Stax had not transmitted the March 2025 bank account update request to Worldpay. As a result, the bank account update had not been completed, and payments were not being processed correctly.

100.    On June 11, 2025, Ms. Osborne re-contacted Melissa Baar at Stax regarding the bank account update. **(Exhibit 3)**.

101.    On June 12, 2025, Plaintiffs participated in a technical support call with Sam C. of Stax Support to address the ongoing bank account update issue. **(Exhibit 27)**.

102.    During the June 12, 2025 technical support call, Sam C. affirmatively stated that he did not see any issue on Stax's end and that the account appeared to be functioning properly, thereby reassuring Plaintiffs that no further corrective action was required at that time.

103.    On June 12, 2025, at 8:43 AM, following the technical support call, Sam C. sent an email to Ms. Osborne stating that Stax had updated the account for the Stax subscription in April, but that "the step missing is to update the bank account for the processing bank World Pay." Sam C. provided a phone number for Worldpay and instructed Plaintiffs to call Worldpay to complete the update. **(Exhibit 27)**.

104.    The June 12, 2025 email from Sam C. was delivered to Plaintiffs' spam folder.

105.    Stax did not follow up to confirm that Plaintiffs had received the June 12, 2025 email or the instructions it contained.

106.    Plaintiffs did not discover the June 12, 2025 email until December 2025, after a funding hold had already been placed, when the issue was identified by Jessica Olsen of Stax personnel during subsequent communications.

107.    Throughout this period, Plaintiffs reasonably relied on Defendants' affirmative representations and reassurances that the bank account update had been completed and that payments were being processed without issue.

108.    Plaintiffs' reliance on these reassurances was reasonable given Defendants' superior control over the processing system and Defendants' affirmative statements that no issue existed.

### G. Defendants' Failure to Notify of ACH Returns

109.    In late June 2025, as a result of the failed bank account update, ACH transfers of funds from Worldpay and Fifth Third to Unified Growth's old bank account began to be rejected and returned. According to Kennedy Usoro's July 8, 2025 email, Plaintiffs received a total of 11 ACH rejects in June 2025 totaling $117,731.86 due to attempts to bill the closed bank account.

110. As the Originating Depository Financial Institutions (ODFIs) under NACHA Operating Rules, Worldpay and Fifth Third received these ACH returns and the associated return codes (e.g., R02 - Account Closed). The NACHA Operating Rules reflect the industry standard of care applicable to ODFIs.

111. The industry standard of care requires an ODFI to promptly notify the originator (Unified Growth) of any ACH returns.

112. Defendants provided no notice to Unified Growth of the ACH returns.

113. Instead of providing notice, Worldpay and Fifth Third placed a funding hold on Unified Growth's account in the amount of $394,538.19.

114. Defendants provided no notice to Unified Growth of this funding hold.

### *H. The July 2025 Funding Crisis and Its Resolution*

115. On or about July 1, 2025, Plaintiffs discovered that funds were not being deposited into their account and contacted Worldpay by telephone.

116. During the July 1, 2025 telephone call, Plaintiffs learned that the bank account update had not been processed by Worldpay and that ACH transfers were being rejected.

117. On July 1, 2025, Plaintiffs provided the updated bank account information to Worldpay and were told by a Worldpay representative that deposits would resume within 24 to 72 hours.

118. Deposits did not resume within 24 to 72 hours as promised.

119. On July 8, 2025, one week after the July 1 call and after the promised 24-72 hour period had expired without any deposits, Ms. Osborne contacted Worldpay to inquire about the missing funds.

120. On July 8, 2025, Ms. Osborne, Plaintiffs reached out to Worldpay's support.

121. On July 8, 2025, Worldpay's Merchant Services team responded by email, informing Plaintiffs for the first time that the held funds totaling $317,691.19 were "a RISK hold

placed by ES720655 Kennedy Usoro" and were "not ACH Credit Rejections." **(Exhibit 26)**.

122. This was the first time Plaintiffs learned that a funding hold had been placed on their account, as opposed to ongoing ACH rejection issues.

123. On July 8, 2025, after learning from Worldpay Merchant Services that Kennedy Usoro had placed the hold, Ms. Osborne sent an email to Worldpay's Credit Risk team stating: "I'm writing to urgently request a review of $400,000 + being held under my merchant account reserve." **(Exhibit 5)**.

124. On July 8, 2025, Kennedy Usoro, a Worldpay Credit Risk Analyst, responded by email stating that Worldpay had attempted to contact Stax regarding the account but "never heard back from them." **(Exhibit 6)**.

125. On July 8, 2025, at 1:00 PM, Meredith Jackson of Stax apologized for the inconvenience and stated she was "still waiting on the risk team to provide additional details" and had "reached back out to the processing bank requesting an expedited review." **(Exhibit 4A)**.

126. On July 9, 2025, Jessica Olson, a manager at Stax, admitted in an email that Worldpay's correspondence had been sent to an incorrect contact at Stax, stating: "this is why we were not aware of the risk review on your account. I truly apologize for this and understand the significant impact it has on both you and your business." **(Exhibit 7)**.

127. On July 9, 2025, Ms. Osborne submitted a response to Worldpay's risk questionnaire. **(Exhibit 5A)**.

128. During the July 2025 risk review, Kennedy Usoro reviewed Plaintiffs' bank statements, which showed deposits from both Worldpay and Stripe.

129. Kennedy Usoro identified Stripe as an additional payment processor and requested a percentage breakdown of processing volume, stating: "These processors were identified on your bank statements." **(Exhibit 5C)**.

130. Ms. Osborne responded that Stripe was used for separate software products and that "World pay does 100% of our processing" for Unified Growth. **(Exhibit 5D)**.

131. On July 10, 2025, after reviewing this information, Mr. Usoro confirmed in writing that he had "completed [his] review" and that "no further action is required" as "the business may continue to process as normal." **(Exhibit 5B).**

132. Kennedy Usoro released all $394,538.19 in held funds. **(Exhibit 5B).**

133. On August 4, 2025, Meredith Jackson of Stax confirmed Stax would issue a credit for one month of fees and apologized "for any inconvenience you encountered." **(Exhibit 8).**

### I. Plaintiffs' Diversification and Defendants' Response

134. On July 15, 2025, Plaintiffs' counsel issued Duty to Preserve Evidence letters to Stax and Worldpay.

135. Following the July 2025 funding crisis, Unified Growth began to diversify its payment processing relationships to mitigate future risk, establishing accounts with other processors in or around July 2025.

136. The Merchant Agreement's fee structure is based on transaction volume. Unified Growth's diversification of processing volume resulted in a decrease in revenue earned by Defendants from the account.

137. On October 28, 2025, Ms. Jackson of Stax informed Plaintiffs that Worldpay had initiated a second risk review and placed a new funding hold on their account. **(Exhibit 10).** The stated reasons for the risk review included chargebacks, a decrease in processing volume, and requests for supporting documentation for two transactions totaling $3,500 that occurred on October 1, 2025.

138. Plaintiffs' October 2025 chargebacks involved only three unique customers.

139. On November 12, 2025, after Plaintiffs provided documentation addressing the stated reasons for the review, Ms. Jackson stated in an email: "Unfortunately, multiple processors are not allowed per the processing agreement. Please cancel the other processor account and attach documentation reflecting the closure in order for the review to proceed." **(Exhibit 12).**

140.   In Exhibit 12, Plaintiffs stated they "made the strategic decision to diversify our merchant processing" and used the phrase "rather than rely on a single processor." Plaintiffs made this business decision to use multiple processors to mitigate risk after Defendants' June-July 2025 funding hold, during which Defendants withheld Plaintiffs' funds for weeks. At the time Plaintiffs made this decision in July 2025, Plaintiffs had no knowledge of any contractual restriction on using multiple processors. Plaintiffs first learned of the exclusivity provision on November 12, 2025.

141.   On November 20, 2025, after Plaintiffs explained they could not terminate their other processing relationships, Ms. Jackson notified them that "Worldpay has made the decision to terminate the account." **(Exhibit 14)**.

142.   Plaintiffs had no knowledge of any exclusivity provision until November 12, 2025, when Kennedy Usoro first raised the issue during a risk review call. Prior to November 12, 2025, no Defendant representative had ever mentioned or disclosed any restriction on using multiple processors. Plaintiffs' July 2025 decision to use multiple processors was made without knowledge of any contractual restriction. Plaintiffs used multiple processors for business continuity following Defendants' June-July 2025 funding hold.

143.   According to Meredith Jackson, industry standard procedure for genuinely high-risk merchants is to hold funds for 180 days to cover future liabilities. **(Exhibit 28)**.

144.   Defendants waited 14 days after the November 20, 2025 termination before placing Plaintiffs on the MATCH system on December 4, 2025.

### J. The Wrongful MATCH Placement and Reversal

145.   Mastercard MATCH Pro is a mandatory system for Mastercard Acquirers. Mastercard MATCH Pro Developer Documentation, **(Exhibit 34)**.

146.   Mastercard MATCH Pro operating procedures require acquiring banks to submit merchants to the MATCH system within five (5) calendar days of the decision to terminate a merchant that meets one of the MATCH Pro reason codes. *Id.*

147.   Mastercard MATCH Pro requires that acquiring banks act diligently, reasonably, and in good faith to comply with MATCH system requirements. § 11.2.2, **(Exhibit 34)**

148. MATCH Pro uses defined reason codes (Table 11.4) to identify the specific basis for a merchant listing; "multiple processors" is not a MATCH Pro reason code. **(Exhibit 34)**

149. The Merchant Agreement identifies placement on "the MATCH (Membership Alert to Control High Risk Merchants) System" as an Event of Default. **(Exhibit 20A, Section 7)**.

150. The Merchant Agreement requires merchants to warrant that they "have never appeared on MasterCard's MATCH system or the Combined Terminated Merchant File" as a condition of approval. **(Exhibit 20A, Section 17.D)**.

151. The MATCH system identifies business entities and individual owners by name, address, date of birth, phone numbers, email, and government identification information.

152. On December 2, 2025, during a phone call with Ms. Osborne, Kennedy Usoro of Worldpay stated that Plaintiffs' account was historically healthy, that Plaintiffs were not high-risk, and that the July 2025 hold was caused by a resolved administrative issue.

153. Kennedy Usoro confirmed that Plaintiffs were not on the Mastercard Member Alert to Control High-Risk Merchants ("MATCH") system as of December 2, 2025.

154. On December 2, 2025, Ms. Osborne sent an email to Meredith Jackson of Stax requesting information about Plaintiffs' account status, specifically asking: "Were we placed on any internal lists (e.g. high-risk/'MATCH' list)?"

155. On December 4, 2025, Ms. Jackson of Stax responded by email: "Yes, the merchant will be placed on MATCH." **(Exhibit 9)**.

156. On or about December 4, 2025, Defendants caused both Unified Growth and Danelle Osborne personally to be placed on the MATCH system. This action was taken by Fifth Third, as the acquiring bank, based on information and directives from Worldpay and Stax.

157. On December 4, 2025, at 7:37 PM, Meredith Jackson confirmed in writing that "the most recent review does not have any funds on hold at this time to remove" and that "there are currently no funds on hold." **(Exhibit 9)**.

158. In the December 4, 2025 email, Meredith Jackson stated that "The merchant is being terminated because it is against their MPA to have more than one processor." **(Exhibit 9)**.

159. Meredith Jackson stated in the December 4, 2025 email that "When an account is terminated, Worldpay policy is to hold all funds for 180 days from the date of the last transaction" but confirmed that "there are currently no funds on hold." **(Exhibit 9)**.

160. During a phone call with Ms. Osborne, Kennedy Usoro of Worldpay stated that the MATCH placement decision was made by "upper management."

161. The MATCH placement occurred 14 days after the account was terminated.

162. On December 5, 2025, during a second phone call with Ms. Osborne, Kennedy Usoro stated that he was reading from Worldpay's internal notes, that upper management had control of the account, and that Stax was not happy with Worldpay.

163. On December 4, 2025, at 7:21 PM, Stripe notified Plaintiffs that their Ad Depot business account would be terminated because Plaintiffs or "a previous business you were associated with, is listed on MATCH." **(Exhibit 16)**.

164. On December 6, 2025, at 8:34 AM, Stripe sent a termination notice for Plaintiffs' Gonzy business account for the same reason. **(Exhibit 17)**.

165. Stripe gave Plaintiffs four days to switch to new payment processors.

166. On December 9, 2025, Joshua Osborne sent a pre-meeting brief on behalf of Plaintiffs to Jessica Olson of Stax and Shaquaya McGee of Worldpay. **(Exhibit 18)**.

167. On December 9, 2025, Plaintiffs participated in a video conference meeting with Jessica Olson of Stax and Shaquaya McGee of Worldpay.

168. On December 9, 2025, at 10:14 AM, Shaquaya McGee confirmed in writing: "It was a pleasure speaking with everyone today. I am writing to confirm that I have submitted the request to have your account removed from MATCH. I will provide an update as soon as I receive a response from Mastercard." **(Exhibit 21)**.

169. On December 12, 2025, Ms. McGee provided a screenshot confirming that "Merchant UNIFIED GROWTH has been successfully deleted" from the MATCH system by "112101 - Fifth Third Bank." **(Exhibit 19)**.

170. Under Mastercard's MATCH Pro removal standards, a merchant may be removed from the MATCH system where the Authorized User reports that the merchant was added in error. Defendants caused the removal of Plaintiffs' MATCH listing on December 12, 2025. This removal supports the inference that Defendants, or an authorized user acting through them, reported the MATCH listing as erroneous.

### K. Separate Corporate Entities and Collateral Damage

171. Ad Depot, LLC and Gonzy Limited are separate and distinct legal entities from Unified Growth, Inc. Each entity maintains its own independent business operations, bank accounts, tax identification numbers, and merchant processing relationships.

172. Neither Ad Depot, LLC nor Gonzy Limited were parties to the Merchant Processing Agreement between Unified Growth, Inc. and Defendants. Ad Depot and Gonzy had no direct contractual relationship with any Defendant and had never processed payments through Defendants.

173. Ad Depot, LLC maintained an independent merchant processing account with Stripe, Inc. (Account ID: acct_1SCqAKRQsnWet6PQ) for processing payments for Ad Depot's business operations conducted through the website www.addepot.com. Ad Depot's Stripe account was in good standing with no history of fraud, excessive chargebacks, or compliance issues.

174. Gonzy Limited maintained an independent merchant processing account with Stripe, Inc. (Account ID: acct_1SED9pR3fTAEp3vr) for processing payments for Gonzy's business operations conducted through the website www.gonzy.com. Gonzy's Stripe account was in good standing with no history of fraud, excessive chargebacks, or compliance issues.

175. On December 4, 2025, at 7:21 PM, Stripe terminated Ad Depot's merchant account, citing that Ad Depot "or a previous business you were associated with, is listed on

MATCH or another terminated merchant file operated by the card networks." **(See Exhibit 16)**.

176. On December 6, 2025, at 8:34 AM, Stripe terminated Gonzy's merchant account, citing that Gonzy "or a previous business you were associated with, is listed on MATCH or another terminated merchant file operated by the card networks." **(See Exhibit 17)**.

177. Defendants knew or should have known that placing Unified Growth on MATCH would cause the MATCH system to alert all payment processors, including Stripe, and that Stripe would terminate not only Unified Growth's accounts but also the merchant accounts of any related entities of the principals, including Ad Depot and Gonzy.

178. As a direct and proximate result of Defendants' improper MATCH placement, Ad Depot and Gonzy lost their ability to process credit card payments, resulting in immediate and catastrophic business disruption and substantial financial losses.

179. The termination of Ad Depot's and Gonzy's Stripe accounts was solely caused by Defendants' improper MATCH placement of Unified Growth. Ad Depot and Gonzy had no independent basis for termination and were collateral victims of Defendants' misconduct.

## L. The Independent Duties of Defendants

180. The duties of care, honesty, and fair dealing alleged in the tort counts below (Negligence, Defamation, Fraud, Tortious Interference) are independent of the Merchant Processing Agreement.

181. These duties arise from the common law duty to exercise reasonable care when voluntarily undertaking an action known to create a foreseeable risk of substantial economic harm, reputational harm, or personal injury to another. In defining the applicable standard of care, the following sources are probative evidence of the industry standard of care, not independent statutory duties owed to Plaintiffs:

    a. OCC Bulletin 2006-39 (Risk Management of New, Expanded, or Modified Bank Products and Services) and OCC Bulletin 2013-29 (Third-Party Relationships: Risk Management Guidance), which reflect the supervisory

expectations for national banks in managing third-party relationships and new or expanded products, and which establish the standard against which Fifth Third's conduct as the Member Bank should be measured;

**b.**    the Mastercard Security Rules and Procedures (SPME Manual), which reflect the industry standard of care governing MATCH placement decisions by acquirers;

**c.**    the NACHA Operating Rules, which reflect the industry standard of care governing ODFI conduct in ACH processing; and

**d.**    the common law duty to avoid foreseeable harm to the reputation and business of others, including the duty not to engage in conduct that will predictably cause industry-wide blacklisting and the destruction of related business entities.

182.    The harms suffered by Plaintiffs, including industry-wide blacklisting, destruction of separate business entities (Gonzy and Ad Depot), and severe physical and emotional distress to Danelle Osborne, are tortious injuries that exceed the scope of any contractual remedy.

### M. Damages

183.    As a direct and proximate result of Defendants' actions, Unified Growth's annual revenue declined by approximately $4,000,000, from $9,510,984 in 2024 to a projected $5,500,000 in 2025.

184.    As a direct and proximate result of Defendants' actions, Plaintiffs were forced to obtain emergency financing.

185.    Plaintiffs drew $180,000 from a business line of credit personally guaranteed by Ms. Osborne.

186.    Ms. Osborne obtained a $500,000 Home Equity Line of Credit (HELOC) secured by her personal residence to provide emergency funding for Unified Growth.

187.    Ms. Osborne's name and personal identifying information were placed on the MATCH system on December 4, 2025.

188. Ms. Osborne's name and personal identifying information were removed from the MATCH system on December 12, 2025.

189. In 2025, based on its 2024 revenue performance, Unified Growth was recognized as #3397 on the Inc. 5000 list of fastest-growing private companies in America.

190. Sean Kochel served as President of Unified Growth from 2020 through September 2025. Mr. Kochel was responsible for advertising, operations, payment processing, lead generation, and customer service.

191. Seth Fenstermaker served in a senior leadership role at Unified Growth from 2020 through September 2025. Mr. Fenstermaker was responsible for lead generation, sales, setting management, and team operations.

192. At the end of July 2025, following the funding crisis, both Mr. Kochel and Mr. Fenstermaker decided to leave Unified Growth.

193. Between July and September 2025, Mr. Kochel and Mr. Fenstermaker worked to transition their responsibilities and establish systems to allow Mr. and Ms. Osborne to assume their roles.

194. On September 22, 2025, Mr. Kochel and Mr. Fenstermaker notified Mr. Osborne via video conference of their formal departure from Unified Growth.

195. During the September 22, 2025 video conference, Mr. Kochel and Mr. Fenstermaker stated that they were departing because the company was not as financially stable as they believed, specifically citing the July 2025 funding hold as the reason for their loss of confidence in the company's financial stability.

196. Between July 2025 and December 2025, as a direct result of decreased lead flow caused by the July 2025 funding crisis and the departure of Mr. Kochel and Mr. Fenstermaker, Unified Growth was forced to reduce its sales workforce from 17 individuals (8 setters and 9 closers) to 8 individuals (4 setters and 4 closers), a reduction of 53%.

197. During the same period, Unified Growth terminated relationships with 2 video production professionals, 1 developer, and 2 writers due to reduced business capacity.

198. In September 2025, after Mr. Kochel and Mr. Fenstermaker announced their departure, Claire Lavergne, a sales closer, terminated her contract with Unified Growth. Ms. Lavergne returned to work with Unified Growth approximately three weeks later.

199. **Initial Funding Hold and Disruption.** The initial $394,538.19 funding hold imposed by Defendants in June-July 2025 constituted a direct financial injury and was the catalyst for the subsequent business disruption and loss of key personnel.

200. **Operational Inefficiency and Increased Costs.** As a direct result of being forced to diversify payment processors, Plaintiffs suffered significant and ongoing damages from operational inefficiencies, including but not limited to: increased administrative overhead from managing multiple platforms, cash flow fragmentation, loss of volume-based pricing discounts, and increased transaction fees.

201. **Executive Opportunity Cost.** From June through December 2025, the entirety of the executive team's time and resources were diverted from revenue-generating activities (such as sales, marketing, and product development) to crisis management, resulting in significant lost sales opportunities and a complete paralysis of business growth initiatives.

202. The MATCH placement directly and foreseeably caused Stripe, Inc. to terminate the merchant accounts of Gonzy Limited and Ad Depot LLC, resulting in the loss of their ability to process payments and substantially impairing the continued operation and viability of those separate business entities.

203. **Industry Blacklisting.** The MATCH placement has rendered Plaintiffs unable to obtain new merchant processing accounts from other providers, effectively blacklisting them from the financial services industry and making it impossible to conduct business normally.

204. **Permanent Impairment of Earning Capacity.** The placement of Danelle Osborne personally on the MATCH system has caused permanent and severe damage to her professional reputation and future earning capacity. This black mark will follow her for the remainder of her working life, severely limiting her ability to own or operate any business that requires merchant processing.

**205.**  **Emotional Distress.** As a direct result of being personally identified and blacklisted in a system designed to identify fraudsters, money launderers, and other bad actors, Ms. Osborne has suffered, and continues to suffer, significant emotional distress, anxiety, humiliation, and mental anguish.

**206.**  **Total Compensatory Damages.** The total amount of compensatory damages resulting from the combined harms detailed above is believed to exceed $8,500,000, with the final amount to be proven at trial.

## COUNT I: NEGLIGENCE

### (Danelle Osborne, Gonzy Limited, and Ad Depot LLC against Worldpay ISO Inc., Fifth Third Bank, N.A., and Fattmerchant, Inc. d/b/a Stax Payments)

**207.**  Plaintiffs Danelle Osborne, Gonzy Limited, and Ad Depot LLC incorporate by reference paragraphs 25 through 207 of the Facts Common to All Counts as if fully set forth herein.

### A. The Factual Basis for Defendants' Duty of Reasonable Care

**208.**  Defendant Fifth Third Bank, as a condition of participating in the Mastercard payment network, is required to comply with the mandatory *Mastercard Rules and Procedures*. These rules reflect the industry standard of care for when and how acquiring banks may place merchants on the MATCH system. **(Exhibit 34)**

**209.**  The Mastercard Rules require that a merchant be placed on MATCH only if the merchant meets one of fourteen enumerated reason codes, and that placement occur within five calendar days of the termination decision. These rules are designed to prevent arbitrary or retaliatory use of the MATCH system, which Mastercard holds out to the public and to regulators as a tool to protect the payment network from genuinely high-risk merchants.

**210.**  Defendant Fifth Third Bank is a national bank supervised by the Office of the Comptroller of the Currency. As an ODFI in the ACH network, Fifth Third's conduct is measured against the industry standard of care reflected in OCC Bulletin 2006-39 (Risk Management of New, Expanded, or Modified Bank Products and Services) and OCC Bulletin 2013-29 (Third-Party Relationships: Risk Management Guidance). These

Bulletins establish the industry standard of care for risk management by banks processing ACH transactions, including requirements to monitor originator return rates and conduct ongoing credit analysis, and for the oversight of third-party relationships, including relationships with ISOs like Worldpay ISO Inc.

211. Defendants Worldpay and Stax, as payment processors operating within the Mastercard network, knew that Fifth Third's authority to place merchants on MATCH was strictly governed by the mandatory Mastercard Rules and that an improper placement would cause severe and irreversible harm to merchants.

212. Defendants knew that Plaintiff Danelle Osborne was the principal owner of Unified Growth, Gonzy Limited, and Ad Depot LLC. Defendants knew that placing Ms. Osborne personally on the MATCH system would result in the publication of her name and personal identifying information to a global database accessible by all payment processors.

213. Defendants knew, based on their position as industry insiders, that this publication would cause the immediate and automatic termination of all merchant processing accounts held by businesses where Ms. Osborne was a principal owner, including Gonzy Limited and Ad Depot LLC.

214. Under Colorado common law, a party that voluntarily undertakes an action that it knows will create a foreseeable risk of physical, emotional, or economic harm to others has a duty to exercise reasonable care. Defendants' decision to place Ms. Osborne on MATCH, knowing the severe and certain consequences, created a duty to exercise reasonable care in making that decision.

215. Defendants' duties of care extended personally to Danelle Osborne because:

a. she was a personal guarantor of the Merchant Agreement, placing her personal assets at direct risk;

b. the MATCH placement targeted her personally by name and identifying information; and

  c. the wrongful conduct caused her direct physical and emotional injury that is distinct from the economic loss suffered by the corporate entities.

216. The duties of care alleged herein are independent of the Merchant Processing Agreement. These duties arise from the common law duty to exercise reasonable care when voluntarily undertaking an action known to create a foreseeable risk of substantial harm to another, informed by the industry standard of care reflected in OCC Bulletin 2006-39, OCC Bulletin 2013-29, the Mastercard Security Rules and Procedures, and the NACHA Operating Rules. These duties would exist even in the absence of a contract between the parties.

### B. Breach of Duties by Each Defendant

217. **Defendant Fifth Third Bank** breached its duty of reasonable care, as informed by the Mastercard Rules, OCC Bulletin 2006-39, OCC Bulletin 2013-29, and NACHA Rules, by:

  a. Submitting the MATCH placement to Mastercard without a valid reason code, as "multiple processors" is not one of the fourteen valid MATCH reason codes;

  b. Submitting the MATCH placement fourteen (14) days after termination, in violation of the mandatory five-calendar day rule;

  c. Failing to conduct a reasonable investigation before submitting the placement, as evidenced by the immediate reversal and its own internal assessment that the account was not high-risk; and

  d. Failing to monitor and notify Plaintiffs of eleven (11) ACH rejects totaling $117,731.86 in June 2025, in violation of the industry standard of care for ODFIs.

218. **Defendant Worldpay** breached its duty of reasonable care by recommending or directing the MATCH placement despite:

  a. Its own Credit Risk Analyst having assessed the account as "historically healthy" and "not high-risk" just two days prior;

  b. Its knowledge that "multiple processors" is not a valid MATCH reason under the mandatory Mastercard Rules; and

    **c.**    Its failure to conduct any meaningful risk investigation that would justify such a destructive recommendation.

**219.**    **Defendant Stax** breached its duty of reasonable care by participating in and facilitating the MATCH placement decision and notifying Plaintiffs of the placement despite:

    **a.**    Its six-year relationship with Plaintiffs and direct knowledge of their high-volume, low-risk processing history;

    **b.**    Its failure to conduct any investigation to determine whether "multiple processors" was a valid ground for MATCH placement under the mandatory Mastercard Rules; and

    **c.**    Its failure to object to or prevent the improper placement it was communicating to Plaintiffs.

### C. Factual Causation and Specific Damages

**220.**    The foregoing breaches were the direct and proximate cause of Plaintiffs' injuries.

**221.**    The termination of Plaintiffs' merchant accounts was the direct, foreseeable, and intended consequence of Defendants' placement of Ms. Osborne on the MATCH system. Defendants knew that MATCH placement would cause immediate termination of all merchant accounts because that is the express purpose of the MATCH system, to alert all payment processors to individuals deemed high-risk so they will refuse to do business with them.

**222.**    On December 4, 2025, the same day Defendants placed Ms. Osborne on MATCH, Stripe terminated Gonzy Limited's merchant processing account. On December 6, 2025, two days after the MATCH placement, Stripe terminated Ad Depot LLC's merchant processing account. In both termination notices, Stripe cited "MATCH listing" as the sole reason for termination.

**223.**    The temporal proximity between the MATCH placement (December 4) and the terminations (December 4 and 6) demonstrates direct causation. Prior to the MATCH placement, neither Gonzy nor Ad Depot had received any notice of account issues, violations, or pending termination from Stripe.

224. As a direct result of the Stripe account terminations, **Plaintiffs Gonzy Limited and Ad Depot LLC** have been unable to accept credit card payments from December 4, 2025, through the present, resulting in a complete loss of revenue. Both companies have been rejected by all other payment processors they have applied to, with those processors citing Ms. Osborne's MATCH listing as the reason for rejection.

225. Defendants' negligent conduct caused two distinct rounds of personal injury to Plaintiff Danelle Osborne.

226. **First,** beginning in July 2025, Defendants' wrongful withholding of $394,538.19 in funds caused Ms. Osborne severe financial stress. This stress manifested in physical symptoms including anxiety, difficulty sleeping, and loss of appetite. These symptoms were directly caused by Defendants' breach of their duty to monitor ACH returns and notify Ms. Osborne, which led to the wrongful hold.

227. **Second,** Ms. Osborne's symptoms, which had been severe but manageable, became catastrophic in December 2025 following Defendants' placement of her on the MATCH system. The MATCH placement caused immediate termination of all her businesses' merchant accounts, destroying her livelihood and any hope of financial recovery. This second negligent act caused Ms. Osborne's condition to deteriorate dramatically, resulting in a 20-pound weight loss and the need for formal medical treatment at a Veterans Affairs Hospital in December 2025.

228. While Ms. Osborne may have experienced ordinary life stress prior to July 2025, she had never experienced physical manifestations requiring medical intervention until Defendants' wrongful conduct began. The timing, severity, and medical necessity of Ms. Osborne's symptoms establish direct causation.

229. Because Defendants' negligence caused direct physical injury to Danelle Osborne requiring medical intervention and resulting in significant physical deterioration (20-pound weight loss, anxiety, insomnia), the Economic Loss Rule does not bar Plaintiffs' negligence claims. The harm suffered is not merely "economic loss" but includes personal physical injury and emotional distress that are traditionally compensable in tort. *See Town of Alma v. AZCO Construction, Inc.,* 10 P.3d 1256 (Colo. 2000).

230. In addition to her physical and emotional injuries, Ms. Osborne was forced to secure a $500,000 Home Equity Line of Credit against her personal residence in December 2025 to keep the company alive after Defendants' wrongful conduct destroyed the company's cash flow and access to merchant processing, placing her personal assets at direct risk.

231. As a direct and proximate result of Defendants' negligence, Plaintiffs have suffered significant damages as detailed in the Damages section of this Complaint, in an amount to be proven at trial but believed to exceed **$8,500,000.**

232. **Reservation of Exemplary Damages.** Plaintiffs reserve their right, pursuant to C.R.S. § 13-21-102(1.5)(a), to seek leave to amend this Complaint to add a claim for exemplary damages after the exchange of initial disclosures under Fed. R. Civ. P. 26 and upon a prima facie showing of a triable issue.

## COUNT II: BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

### (Unified Growth, Inc. and Danelle Osborne against Worldpay ISO Inc., Fifth Third Bank, N.A., and Fattmerchant, Inc. d/b/a Stax Payments)

233. Plaintiffs Unified Growth, Inc. and Danelle Osborne incorporate by reference paragraphs 25 through 207 of the Facts Common to All Counts as if fully set forth herein.

### *Existence of Contract*

234. On or about September 4, 2019, Plaintiffs entered into a Merchant Processing Agreement with Defendants for payment processing services.

235. Under the agreement, Defendants agreed to provide payment processing services to Plaintiffs.

### *Implied Covenant of Good Faith and Fair Dealing*

236. Under Colorado law, every contract contains an implied covenant of good faith and fair dealing, which requires parties to refrain from arbitrary or unreasonable conduct that has the effect of preventing the other party from receiving the fruits of the bargain.

### Defendants' Breaches of the Implied Covenant

#### A. Stax's Bad Faith Conduct Causing July 2025 Funding Hold

237. In March 2025, Plaintiffs requested that Stax update their bank account information. Stax failed to transmit this request to Worldpay.

238. On June 3, 2025, Melissa Baar of Stax falsely represented to Plaintiffs that "all payments are being processed with no problems," concealing Stax's failure to update the bank account and preventing Plaintiffs from taking protective measures.

239. On June 11, 2025, after continuing to experience issues, Plaintiffs re-contacted Stax regarding the bank account update **(Exhibit 3)**. On June 12, 2025, Plaintiffs participated in a technical support call with Sam C. of Stax Support. During this call, Sam C. stated that he could not see anything wrong on his end and that everything looked fine. However, immediately following the call, Sam C. sent an email stating that "the step missing is to update the bank account for the processing bank World Pay." This email, which contradicted his statement on the call, was delivered to Plaintiffs' spam folder, and Stax did not follow up to confirm receipt **(Exhibit 27)**.

240. As a direct result of Stax's failures, Plaintiffs' ACH transfers began to fail in late June 2025, leading to a $394,538.19 funding hold placed by Worldpay.

241. In response to the funding hold and Defendants' repeated failures, Plaintiffs diversified their payment processing to other processors to protect business continuity.

242. Stax's conduct in failing to transmit the bank account update, concealing that failure with a false statement, and failing to ensure Plaintiffs received critical instructions constituted bad faith and deprived Plaintiffs of the benefit of reliable payment processing services.

#### B. Inconsistent and Bad Faith Exercise of Discretion Regarding Multiple Processors

243. On July 10, 2025, after reviewing Plaintiffs' bank statements showing deposits from both Worldpay and Stripe, Defendant Worldpay, through its Credit Risk Analyst Kennedy Usoro, exercised its discretion to waive enforcement of any restriction on multiple

processors by stating that "no further action is required" and "the business may continue to process as normal."

244.    On October 28, 2025, Defendants initiated a second risk review, citing both a high chargeback **percentage** and a **decrease in processing volume (Exhibit 10)**. Both of these conditions were a direct result of Defendants' own prior actions, which had forced Plaintiffs to significantly reduce their transaction volume processed through Defendants. The reduced volume created a misleadingly high chargeback **ratio,** and Defendants then used both the inflated ratio and the reduced volume, the very conditions they had created, as the basis for the review.

245.    On November 12, 2025, Defendants reversed their prior exercise of discretion and demanded that Plaintiffs close all other processor accounts as a condition of resolving the second risk review. **(Exhibit 12)**

246.    On November 12, 2025, when Plaintiffs refused to close their other processor accounts, Defendants terminated the Merchant Processing Agreement. **(Exhibit 14)**

247.    Upon termination on November 20, 2025, Defendants immediately released all funds and held no reserves, demonstrating their own assessment that Plaintiffs posed no financial risk. **(Exhibit 9)**

248.    Defendants' inconsistent exercise of discretion, approving multiple processors in July when it benefited them, then terminating for the same reason in November after their revenue decreased, was arbitrary, unreasonable, and constituted bad faith.

### *C. Punitive and Bad Faith Use of MATCH Placement*

249.    On December 2, 2025, Kennedy Usoro stated that Plaintiffs' account was "historically healthy" and "not high-risk."

250.    On December 4, 2025, fourteen days after termination and despite this assessment, Defendant Fifth Third Bank placed Plaintiffs on the Mastercard MATCH list.

251.	In the email confirming the MATCH placement, Meredith Jackson of Stax stated that Worldpay's policy was to hold funds for 180 days for high-risk merchants, but that Plaintiffs' account had a "$0 hold" with "no funds on hold." **(Exhibit 9)**

252.	Meredith Jackson stated that the reason for the MATCH placement was "more than one processor." **(Exhibit 9)**

253.	On December 12, 2025, only eight days after the MATCH placement, Defendant Fifth Third Bank reversed the MATCH placement. **(Exhibit 19)**

254.	Defendants' use of MATCH placement was not for legitimate risk management purposes, as evidenced by the absence of any reserve hold and the subsequent removal of the MATCH listing under circumstances consistent with a report that the listing was erroneous.

### *Frustration of Purpose and Deprivation of Benefit of Bargain*

255.	Defendants' conduct frustrated the purpose of the Merchant Processing Agreement, which was to provide reliable payment processing services, and deprived Plaintiffs of the benefit of their bargain.

256.	By approving multiple processors in July 2025 and then terminating the agreement in November 2025 for the same reason, Defendants acted in bad faith to punish Plaintiffs for legitimate business diversification that was undertaken in response to Defendants' own failures.

257.	By placing Plaintiffs on the MATCH list for a non-risk-related reason and despite holding $0 in reserves, Defendants misused their MATCH placement authority for punitive purposes, which deprived Plaintiffs of the ability to obtain payment processing services from other providers and caused severe reputational and financial harm.

### *Causation and Damages*

258.	As a direct and proximate result of Defendants' breach of the implied covenant, Plaintiffs have suffered significant damages as detailed in the Damages section of this Complaint, in an amount to be proven at trial but believed to exceed **$8,500,000.**

**259.** **Reservation of Exemplary Damages.** Plaintiffs reserve their right, pursuant to C.R.S. § 13-21-102(1.5)(a), to seek leave to amend this Complaint to add a claim for exemplary damages after the exchange of initial disclosures under Fed. R. Civ. P. 26 and upon a prima facie showing of a triable issue.

## COUNT III: TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS

### (Asserted by Plaintiffs Gonzy Limited and Ad Depot LLC Against Worldpay ISO Inc., Fifth Third Bank, N.A., and Fattmerchant, Inc. d/b/a Stax Payments)

**260.** Plaintiffs Gonzy Limited and Ad Depot LLC incorporate by reference paragraphs 25 through 207 of the Facts Common to All Counts as if fully set forth herein.

### A. Existence of Valid Business Relationships

**261.** At all times relevant to this action, Plaintiffs Gonzy Limited ("Gonzy") and Ad Depot LLC ("Ad Depot") maintained valid and existing business relationships with the payment processor Stripe, Inc. ("Stripe").

**262.** The business relationship consisted of active and good-standing merchant accounts that enabled Gonzy and Ad Depot to process credit card payments for their respective businesses.

### B. Defendants' Knowledge of the Relationships

**263.** Defendants knew or should have known that placing Plaintiffs' principal, Danelle Osborne, on the MATCH system would cause payment processors, including Stripe, to terminate merchant accounts for all business entities associated with that principal, including Plaintiffs Gonzy and Ad Depot.

**264.** Defendants knew that Danelle Osborne was associated with multiple business entities that utilized payment processors other than Defendants. This knowledge is established by:

    **a.** Defendants' review of bank statements in July 2025, which showed payment processing activity with multiple processors, including Stripe **(Exhibit 5C)**;

    **b.**    Danelle Osborne's July 10, 2025 statement to Defendants that "Stripe was used for separate software products," indicating multiple business operations **(Exhibit 5D)**; and

    **c.**    Defendants' November 12, 2025 demand that Plaintiffs' principal "cancel the other processor account," demonstrating Defendants' awareness of ongoing relationships with competing processors **(Exhibit 12)**.

**265.**    As sophisticated and experienced participants in the payment processing industry, Defendants knew or should have known that:

    **a.**    The MATCH system is an industry-wide database that searches by principal owner name, not just by company name, and alerts all payment processors when a principal is placed on the list;

    **b.**    When a principal is placed on MATCH, all merchant accounts associated with that principal, across all business entities and all payment processors, are subject to termination;

    **c.**    Payment processors, including Stripe, routinely check the MATCH system and terminate merchant accounts when an associated principal appears on MATCH, regardless of whether the specific merchant account had any history of fraud, chargebacks, or compliance issues; and

    **d.**    Placing Danelle Osborne on MATCH would foreseeably cause the termination of all merchant accounts associated with her across the entire payment processing industry, including accounts held by separate business entities such as Gonzy and Ad Depot.

**266.**    Defendants' knowledge of MATCH's industry-wide impact is confirmed by their own Merchant Processing Agreement, which designates a MATCH listing as an "Event of Default" and requires merchants to warrant that neither the merchant nor "any principal, owner, or officer" has ever appeared on MATCH. **(Exhibit 20A)**. This contractual language demonstrates Defendants' awareness that MATCH searches by principal, not just by company name.

267.    Defendants' knowledge that MATCH placement would cause industry-wide termination of all associated merchant accounts is further demonstrated by the fact that Defendants reversed the MATCH placement just eight days after it was imposed, following a meeting with Plaintiffs' counsel on December 9, 2025, indicating Defendants understood the severe and far-reaching consequences of MATCH placement on all entities associated with the listed principal. **(Exhibit 19).**

## C. Intentional and Improper Interference

268.    Defendants, acting in concert, intentionally and improperly interfered with the established business relationships between Plaintiffs and Stripe.

269.    The interference was effectuated through Defendants' collective decision to place Plaintiffs' principal, Danelle Osborne, on the Mastercard MATCH System on December 4, 2025.

270.    Defendant Stax notified Plaintiffs on December 4, 2025 that "the merchant will be placed on MATCH," demonstrating Stax's active and knowing participation in the intentional interference. **(Exhibit 9).**

271.    As sophisticated and experienced participants in the payment processing industry, Defendants knew that placing an entity's principal on the MATCH list, an industry-wide blacklist, would directly and foreseeably cause other processors, including Stripe, to terminate their relationships with any business associated with that principal.

272.    Defendants' own Merchant Agreement confirms their awareness of this fact, as it designates a MATCH listing as an "Event of Default" and requires merchants to warrant they have never appeared on the list. **(Exhibit 20A).**

273.    The interference was improper because it was accomplished by wrongful means and for an improper purpose, including but not limited to retaliation, punishment for a contract dispute, and the anti-competitive misuse of the MATCH system.

## 1. Improper Purpose: Retaliation and Punishment

274. Defendants' placement of Plaintiffs' principal on MATCH was not a legitimate risk-management measure but was instead retaliation for business decisions made by Plaintiffs' affiliated companies.

275. This retaliation was motivated by Unified Growth's decision to diversify its payment processing to mitigate the risk posed by Defendants' prior failures, which had resulted in a $394,538.19 hold on its funds in June-July 2025.

276. The interference was also punishment for Unified Growth's refusal to comply with Defendants' anti-competitive ultimatum on November 12, 2025, to cease doing business with other processors.

277. The interference was further motivated by Defendants' desire to retaliate against Unified Growth for reducing Defendants' transaction volume and revenue by diversifying to competing processors.

278. Defendant Worldpay had previously approved Unified Growth's use of multiple processors, making the subsequent termination for this reason pretextual and punitive rather than based on any legitimate contractual violation.

279. The punitive and pretextual nature of the MATCH placement is evidenced by the facts that:

    a. the subject merchant account had a $0 balance and no outstanding risk at the time of termination;

    b. Defendants' own risk department had assessed the account as "historically healthy" and "not high-risk" just two days prior on December 2, 2025;

    c. the stated reason for termination was a contract dispute ("multiple processors"), not a risk-based reason code recognized by Mastercard;

    d. there was a fourteen-day delay between the November 20, 2025 termination and the December 4, 2025 MATCH placement, indicating the MATCH placement was not a contemporaneous risk assessment but a delayed punitive measure; and

    **e.**    Defendants reversed the MATCH placement just eight days after a meeting with Plaintiffs' counsel on December 9, 2025, indicating it was not based on a legitimate, non-remediable risk.

## 2. *Improper Means: Abuse of the MATCH System*

**280.** Defendants weaponized the MATCH system, which is an essential industry utility intended for fraud and risk mitigation, as a tool for contract enforcement and to eliminate competition.

**281.** By placing Plaintiffs' principal on MATCH for a non-risk, contractual reason, Defendants abused their control over essential payment processing infrastructure to destroy Plaintiffs' relationships with a competing processor.

**282.** This conduct was wrongful and tortious because it prevented Plaintiffs from mitigating damages from Defendants' conduct and coerced them into dependence on Defendants' services.

## D. *Causation*

**283.** Defendants' intentional and improper act of placing Danelle Osborne on the MATCH list was the direct and proximate cause of the termination of Gonzy's and Ad Depot's business relationships with Stripe.

**284.** On December 4, 2025, at 7:21 PM, just hours after the MATCH placement, Stripe notified Ad Depot that its account was being terminated, stating: "Unfortunately, it looks like your website, www.addepot.com, or a previous business you were associated with, is listed on MATCH or another terminated merchant file operated by the card networks. In this situation, we will not be able to continue accepting charges on your Stripe account." **(Exhibit 16)**.

**285.** On December 6, 2025, at 8:34 AM, Stripe sent an identical termination notice to Gonzy, explicitly citing the MATCH listing as the sole reason for termination. **(Exhibit 17)**.

**286.** Both terminations occurred within two to four days of Defendants' MATCH placement and explicitly cited MATCH as the sole reason for termination.

### E. Damages

287. As a direct and proximate result of Defendants' tortious interference, Plaintiffs Gonzy and Ad Depot have suffered significant pecuniary harm and other damages.

288. These damages include, but are not limited to, the loss of their Stripe merchant accounts, lost revenue from the inability to process payments, loss of customer relationships, reputational harm within the industry, diminished business value and goodwill, ongoing business disruption, and lost business opportunities.

289. The damages suffered by Gonzy and Ad Depot as a result of Defendants' conduct exceed **$1,000,000.**

290. **Reservation of Exemplary Damages.** Plaintiffs reserve their right, pursuant to C.R.S. § 13-21-102(1.5)(a), to seek leave to amend this Complaint to add a claim for exemplary damages after the exchange of initial disclosures under Fed. R. Civ. P. 26 and upon a prima facie showing of a triable issue.

## COUNT IV: INTENTIONAL MISREPRESENTATION AND RECKLESS MISREPRESENTATION

### (Unified Growth, Inc. against Worldpay ISO Inc., Fifth Third Bank, N.A., and Fattmerchant, Inc. d/b/a Stax Payments)

291. Plaintiff Unified Growth, Inc. incorporates by reference paragraphs 25 through 207 of the Facts Common to All Counts as if fully set forth herein. Defendants made false representations of material fact with knowledge of their falsity or with reckless disregard for their truth, intending to induce Plaintiff's reliance and to maintain Plaintiff's dependence on Defendants' services.

292. Defendant Fifth Third Bank is liable for the intentional and reckless misrepresentations of Defendants Worldpay and Stax under the doctrines of vicarious liability and apparent authority. Pursuant to the Merchant Application and the Merchant Processing Agreement, both Worldpay and Stax (formerly Fattmerchant) are registered Independent Sales Organizations (ISOs) and Member Service Providers (MSPs) of Fifth Third Bank. They

are parallel agents of Fifth Third Bank, not in a sub-agent relationship. Both Melissa Baar and Kennedy Usoro were acting within the scope of their authority when they made the misrepresentations at issue. Unified Growth reasonably believed both had authority to speak on Fifth Third's behalf. Melissa Baar and Kennedy Usoro made these representations with knowledge of their falsity or with reckless disregard for their truth. Additionally, Fifth Third owed an independent duty to provide accurate information to its merchant and breached that duty by failing to supervise and control its agents and by permitting its agents to make false representations without verification.

### First Misrepresentation: Melissa Baar's June 3, 2025 Statement

293. Melissa Baar, as a Stax manager, made a false representation that "all payments are being processed with no problems" when she knew or should have known that: (1) Stax had failed to transmit the March 25, 2025 bank account update to Worldpay; (2) payments were NOT being processed correctly; and (3) ACH transfers were being rejected. Melissa Baar made this representation without verifying the account status, demonstrating reckless disregard for its truth. She intended to induce Plaintiff's continued reliance on Stax's services and to conceal Stax's failure to process the account update.

### Second Misrepresentation: Kennedy Usoro's July 10, 2025 Statement

294. Kennedy Usoro, as Worldpay's Credit Risk Analyst, made a false representation that "no further action is required" and "the business may continue to process as normal" when he knew or should have known that:

1. the Merchant Processing Agreement contained an exclusivity clause (Section 1.B of Exhibit 20A) restricting multiple processors;

2. Plaintiff was using multiple processors (Stripe and Worldpay); and

3. this use violated the exclusivity clause. Kennedy Usoro made this representation without reviewing the contract terms or without disclosing the exclusivity restriction, demonstrating reckless disregard for its truth. He intended to induce Plaintiff's continued reliance on Worldpay and to conceal the exclusivity restriction until such time as Worldpay could use it as grounds for termination.

### Duty to Provide Accurate Information

295. As Unified Growth's payment processor and primary point of contact, Defendants Stax and Fifth Third Bank owed a duty to Unified Growth to provide accurate information about account status and payment processing when specifically asked. This duty arises not from the merchant processing agreement, but from Stax's voluntary undertaking to provide information in response to a specific inquiry. Intentional misrepresentation and reckless misrepresentation are independent torts recognized under Colorado law as exceptions to the economic loss rule. As Manager of Accounts Receivable, Ms. Baar held herself out as having authority and expertise regarding account status. Unified Growth had no independent means to verify the accuracy of the information, as Stax was the sole intermediary between Unified Growth and Worldpay's systems.

296. As the payment processor conducting a formal risk review, Defendants Worldpay and Fifth Third Bank owed a duty to Unified Growth to provide accurate information about account compliance and requirements. This duty is independent of any contractual obligation and arises from their superior knowledge of their own risk-assessment procedures and Unified Growth's reasonable reliance on their guidance as the entity conducting the review.

### Justifiable Reliance

297. Unified Growth justifiably relied on both false representations. Unified Growth had no independent access to Stax's or Worldpay's internal systems and no way to verify whether the bank account update had been completed or whether payments were flowing to the new account. It is reasonable for a merchant to rely on its payment processor's representations about payment processing status. In direct reliance on the statement that there were "no problems," Unified Growth took no further action and did not escalate the inquiry to Worldpay. Similarly, in reliance on the July 10, 2025 statement that "no further action is required," Unified Growth continued to operate with both Worldpay and Stripe, did not take steps to consolidate processing, and continued to invest in its business operations under the belief that it was in full compliance.

### Damages

298. As a direct and proximate result of its reliance on Ms. Baar's misrepresentation, Unified Growth's discovery of the $394,538.19 funding hold was delayed by approximately 30 days. This delay caused specific, quantifiable harm. Had Unified Growth discovered the hold in early June, it would have immediately worked with Worldpay to resolve the bank account update issue and address any concerns about ACH rejects. Instead, the 30-day delay caused the problem to escalate, required Unified Growth to secure emergency financing at significant cost, caused Unified Growth to miss payroll obligations, and damaged Unified Growth's relationship with Worldpay by allowing the issue to fester unresolved. The delay transformed what could have been a routine account update into a crisis that ultimately contributed to the termination of the merchant account.

299. As a direct and proximate result of its reliance on Mr. Usoro's misrepresentation, Unified Growth continued for four months down a path that led directly to its termination and MATCH placement. But for the misrepresentation, Unified Growth would have immediately taken steps to either close its Stripe account or transition away from Worldpay to a processor that permitted its business model, thereby avoiding the subsequent termination and MATCH placement.

300. As a direct and proximate result of the foregoing intentional and reckless misrepresentations by all Defendants, Unified Growth has suffered damages including, but not limited to, the financial strain caused by the 30-day delay in discovering the funding hold, the complete loss of its business following the termination and MATCH placement, lost revenue, emergency financing costs, workforce reduction, loss of other merchant accounts, inability to obtain new merchant processing, increased processing fees, reputational harm, and diminished enterprise value, the total amount of which exceeds **$8,500,000.**

301. **Reservation of Exemplary Damages.** Plaintiff reserves its right, pursuant to C.R.S. § 13-21-102(1.5)(a), to seek leave to amend this Complaint to add a claim for exemplary damages after the exchange of initial disclosures under Fed. R. Civ. P. 26 and upon a prima facie showing of a triable issue.

## COUNT V: BREACH OF CONTRACT

**(Asserted by Plaintiff Unified Growth, Inc. Against Defendants Worldpay ISO Inc., Fifth Third Bank, N.A., and Fattmerchant, Inc. d/b/a Stax Payments)**

302. Plaintiff Unified Growth, Inc. incorporates by reference paragraphs 25 through 207 of the Facts Common to All Counts as if fully set forth herein.

303. Following the wrongful termination and MATCH placement in December 2025, Plaintiffs obtained and reviewed the complete Merchant Processing Agreement, including the 34-Page Terms and Conditions, for the first time with the assistance of legal counsel. Upon review, Plaintiffs identified the following breaches of contract by Defendants.

### A. Existence of Contract

304. All three Defendants are parties to the Merchant Processing Agreement.

305. Defendant Fifth Third Bank, N.A. ("Fifth Third") is the Member Bank and acquiring bank.

306. Defendant Worldpay, f/k/a Worldpay ISO Inc. ("Worldpay") is a registered Independent Sales Organization ("ISO") of Fifth Third and a co-party to the Agreement.

307. Defendant Fattmerchant f/k/a Stax Payments ("Stax") is a registered Independent Sales Organization ("ISO") of Fifth Third and a co-party to the Agreement. Under the plain terms of the Merchant Application **(Exhibit 20)**, which states on every page that Worldpay and Stax (as Fattmerchant) are registered ISOs/MSPs of Fifth Third, both Worldpay and Stax acted as agents of Fifth Third in connection with the merchant processing relationship. Accordingly, Fifth Third is vicariously liable for the contractual breaches of its agents, Worldpay and Stax.

### B. Contract Formation and Enforceability

308. On September 4, 2019, Unified Growth and Defendants entered into a Merchant Processing Agreement consisting of, at minimum, the 6-Page Agreement signed during the conference call.

309.    To the extent the 34-Page Terms were incorporated by reference into the 6-Page Agreement, those Terms created contractual obligations binding on both parties.

310.    Alternatively, even if the 34-Page Terms were not properly incorporated at the time of signing, Defendants' conduct over six years of performance demonstrated acceptance of the terms contained in both the 6-Page Agreement and the 34-Page Terms, creating an enforceable contract.

311.    Alternatively, the obligations alleged herein arise from the 6-Page Agreement itself, industry standards incorporated into the agreement, and the implied covenant of good faith and fair dealing.

312.    For purposes of this Count, Plaintiffs do not waive their right to challenge the enforceability of specific provisions of the 34-Page Terms, including the arbitration clause and liability limitation, while asserting that Defendants' affirmative obligations under the Agreement are enforceable.

## C. Plaintiff's Performance

313.    Unified Growth performed all of its material obligations under the Merchant Processing Agreement.

314.    Unified Growth processed credit card transactions exclusively through Worldpay's merchant account from September 2019 through June 2025.

315.    Unified Growth paid all processing fees, transaction fees, and other charges assessed by Defendants.

316.    Unified Growth provided requested documentation during risk reviews in July 2025 and October-November 2025.

317.    Unified Growth complied with card network operating regulations and PCI-DSS security standards.

318.    Unified Growth maintained the Designated Account for settlement of transactions.

**319.** Unified Growth fulfilled all "IMPORTANT MERCHANT RESPONSIBILITIES" listed in the 6-Page Agreement.

**320.** Unified Growth submitted a bank account update request on March 25, 2025 to change the Designated Account.

**321.** Unified Growth cooperated with Defendants' requests for information throughout the relationship.

**322.** Unified Growth was not in default under the Agreement at the time of termination.

### D. Defendants' Contractual Obligations

**323.** Under the express terms of the Merchant Processing Agreement and the implied covenant of good faith and fair dealing, Defendants had obligations to provide payment processing services, to accurately and timely transmit account updates to the acquiring bank, to provide timely notice of funding holds, risk reviews, and material account status changes, to communicate material information affecting the merchant account in a timely and accurate manner, and to act in good faith and deal fairly with Unified Growth.

### E. Defendants' Breaches of the Merchant Processing Agreement

**324.** Worldpay breached the Merchant Processing Agreement through its own acts and through the acts of its agent, Stax, for which Worldpay is vicariously liable. Those breaches include, without limitation: (a) failure to process the March 25, 2025 account change request, in breach of Sections 4.A, 5.B, and 8.A; (b) failure to provide notice of the $394,538.19 funding hold, in breach of Section 4.G; (c) the June 3, 2025 false representation by Stax's agent that "all payments are being processed with no problems," in breach of the implied covenant of good faith and fair dealing; (d) contradictory representations in which Kennedy Usoro approved multiple processors on July 10, 2025 and then Meredith Jackson reversed that approval on November 12, 2025 without justification, in breach of the implied covenant; (e) wrongful termination of the Agreement on November 20, 2025 without occurrence of any Event of Default under Section 7.A; and (f) wrongful participation in the December 4, 2025 MATCH placement, in breach of Section 7.E.

### F. Fifth Third's Breaches of the Merchant Processing Agreement

325.    Fifth Third Bank, as Member Bank and co-party to the Merchant Processing Agreement, breached the Agreement by: (a) placing Unified Growth on MATCH on December 4, 2025, for a termination that was not "due to reasons listed in the Operating Regulations" as required by Section 7.E, because "multiple processors" is not a valid reason under Mastercard Security Rules §§ 11.2.2, 11.2.3, and Table 11.4; (b) breaching the implied covenant of good faith and fair dealing by submitting a MATCH placement when Fifth Third held $0 in reserves on November 20, 2025 and its own Credit Risk Analyst had assessed the account as "historically healthy" and "not high-risk" on December 2, 2025; and (c) participating in the wrongful termination as a Member Bank with independent contractual termination rights. The eight-day reversal of the placement on December 12, 2025 confirms it was not based on legitimate risk assessment.

### G. Unconscionability of Sections 9.B and 12.L of the 34-Page Terms (Affirmative Challenge)

326.    To the extent Defendants assert Sections 9.B (Limitation of Liability) and 12.L (Arbitration, Governing Law, Jury Waiver, and Class Action Waiver) of the 34-Page Terms as defenses to Plaintiffs' claims, those provisions are unconscionable and unenforceable under Colorado law.

327.    **Procedural Unconscionability.** The 34-Page Terms were procedurally unconscionable because (a) the 34-Page Terms were not provided to or reviewed by Plaintiffs at the time of signing; (b) access was limited to a buried, and later non-functional, hyperlink; (c) the signing process was compressed to a seven-minute window; (d) the prominent "NO CONTRACT" representation was calculated to discourage review of the incorporated terms; and (e) Defendants occupied a position of superior bargaining power and sophistication relative to Plaintiffs.

328.    **Substantive Unconscionability.** The 34-Page Terms are substantively unconscionable because (a) Section 9.B purports to cap Defendants' liability at approximately $3,000 to $10,000 (one month of processing fees) notwithstanding actual damages exceeding $8,500,000, which would render any remedy illusory; (b) Section 12.L requires arbitration in Hamilton County, Ohio, more than 1,000 miles from Plaintiffs' Colorado

location, with a 50/50 cost-sharing provision that, for a case of this complexity, would exceed $50,000 for Plaintiffs alone; (c) the cost of arbitrating would exceed the maximum recoverable damages by a multiple of ten, making arbitration economically futile; (d) the agreement imposes a shortened one-year statute of limitations that is shorter than Colorado's standard limitations periods; and (e) the agreement disclaims all consequential, incidental, and special damages, including damages for intentional misconduct and gross negligence, which is contrary to Colorado public policy. *See Davis v. M.L.G. Corp.*, 712 P.2d 985 (Colo. 1986); *Core-Mark Midcontinent, Inc. v. Sonitrol Corp.*, 300 P.3d 963 (Colo. App. 2012).

329. **Public Policy.** Sections 9.B and 12.L are also unenforceable to the extent they purport to limit Defendants' liability for intentional misconduct, gross negligence, willful and wanton conduct, fraud, or defamation per se. Colorado public policy bars enforcement of liability limitations and forum selection clauses as to such conduct.

### *H. Causation and Damages*

330. As a direct and proximate result of Defendants' breaches, Unified Growth has suffered damages including: lost use of $394,538.19 for approximately one month; emergency financing costs of $680,000, including $180,000 in lines of credit and a $500,000 HELOC secured against Ms. Osborne's personal residence; lost revenue of approximately $4,000,000, reflecting the decline from $9,510,984 in 2024 to projected $5,500,000 in 2025; workforce reduction costs; operational inefficiency costs from forced diversification to multiple processors; executive opportunity cost from the diversion of executive time to crisis management; increased merchant processing fees due to "high-risk" classification; reputational harm within the payment processing industry; and diminished enterprise value. Total compensatory damages exceed **$8,500,000.**

331. To the extent Defendants' breaches were accompanied by tortious conduct, Unified Growth seeks damages consistent with the tort counts of this Complaint.

### COUNT VI: DEFAMATION PER SE

**(Asserted by Danelle Osborne and Unified Growth, Inc. against Defendants Worldpay ISO Inc., Fifth Third Bank, N.A., and Fattmerchant, Inc. d/b/a Stax Payments)**

332.    Plaintiffs Danelle Osborne and Unified Growth, Inc. incorporate by reference paragraphs 25 through 207 of the Facts Common to All Counts as if fully set forth herein.

### *I. Parties and Agency*

333.    Defendant Fifth Third Bank, N.A. ("Fifth Third") is the Member Bank and acquiring bank that submitted the defamatory MATCH placement against Plaintiffs.

334.    Defendant Worldpay ISO Inc. ("Worldpay") is a registered Independent Sales Organization ("ISO") of Fifth Third and was a co-party to the Merchant Processing Agreement.

335.    Defendant Stax Payments, f/k/a Fattmerchant, Inc. ("Stax") is a registered ISO and Merchant Service Provider ("MSP") of Fifth Third and acted as the primary point of contact for Plaintiffs' account.

336.    Under the plain terms of the Merchant Application **(Exhibit 20)**, both Worldpay and Stax (as Fattmerchant) acted as agents of Fifth Third in connection with the merchant processing relationship. Accordingly, Fifth Third is vicariously liable for the tortious statements and actions taken by its agents, Worldpay and Stax. However, under Colorado law, agents may also be held directly liable for their own tortious conduct.

### *II. The Defamatory Statement: A False Accusation of High-Risk Conduct*

337.    On or about December 4, 2025, Defendants published a false and defamatory statement about Plaintiffs to the entire payment processing industry by placing Unified Growth, Inc. and its principal, Ms. Danelle Osborne, on the Mastercard Member Alert to Control High-Risk Merchants ("MATCH") system.

338.    The MATCH system is a blacklist used by financial institutions to identify merchants who have been terminated for cause. A MATCH listing is the industry's equivalent of a financial death sentence, communicating to all acquiring banks and processors that the listed merchant and its principals are too high-risk to do business with.

339. The defamatory MATCH placement explicitly identified: (a) **Unified Growth, Inc.** as the terminated merchant entity; (b) **Ms. Danelle Osborne** by name as the principal of the business; and (c) **Fifth Third Bank** as the acquiring bank that submitted the placement.

340. The clear meaning of this statement, when published to the financial industry, was that Plaintiffs had engaged in conduct that warranted termination for cause and industry-wide blacklisting, such as fraud, money laundering, excessive chargebacks, or other illegal or high-risk activities.

### III. *The Statement Was Defamatory Per Se*

341. The MATCH placement constitutes defamation per se under Colorado law because the statement, on its face and without the need for extrinsic proof, imputes to Plaintiffs an unfitness to engage in their business and a want of integrity in the discharge of their business duties. Being blacklisted on a high-risk merchant database is inherently damaging to the reputation of a business and its principal.

342. The statement was particularly defamatory per se as to Ms. Osborne personally. By identifying her by name as the principal of a blacklisted entity, Defendants imputed to her personally that she is unfit to engage in business, lacks integrity, and has engaged in conduct so severe as to warrant an industry-wide ban.

### IV. *Publication to the Entire Financial Industry*

343. **Joint Publication by All Three Defendants.** The defamatory statement was published by all three Defendants acting in concert. The decision was a coordinated effort, and each Defendant played a role in the publication:

   a. **Publication by Stax:** On December 4, 2025, before the placement was visible in the MATCH system, Defendant Stax published the statement in writing to Plaintiffs. In an email, Stax manager Meredith Jackson stated unequivocally, "Yes, the merchant will be placed on MATCH." **(Exhibit 9)**. This written confirmation demonstrates Stax's direct knowledge of and participation in the collective decision to publish the defamatory statement.

b.   **Participation by Worldpay:** Defendant Worldpay participated in the decision at an "upper management" level. On December 5, 2025, Worldpay's Credit Risk Analyst, Kennedy Usoro, admitted to Ms. Osborne that the decision was made by "upper management," overriding his own assessment that the account was "historically healthy" and "not high-risk." This confirms Worldpay's direct involvement and control over the decision-making process.

c.   **Execution by Fifth Third:** Defendant Fifth Third, as the acquiring bank and Mastercard member, executed the collective decision by physically submitting the MATCH placement into the Mastercard system, thereby broadcasting the defamatory statement to the entire financial industry.

344.   **Immediate Industry-Wide Effect.** The publication had its intended and immediate effect. On the same day, December 4, 2025, at 7:21 PM, Stripe, a major payment processor, notified Plaintiffs' affiliated company, Ad Depot LLC, that its account would be terminated, stating explicitly it was because "a previous business you were associated with, is listed on MATCH." **(Exhibit 16).** This demonstrates direct reliance on the defamatory statement by a key third party.

345.   **Compounding Damages.** Two days later, on December 6, 2025, at 8:34 AM, Stripe notified another of Plaintiffs' affiliated companies, Gonzy Limited, that its account would also be terminated for the same reason, compounding the financial and reputational harm. **(Exhibit 17).**

### *V. The Statement Was False*

346.   The defamatory statement was false. Plaintiffs had not engaged in any conduct that would warrant a MATCH listing. The placement was an ultra vires act made in violation of Mastercard's own Operating Regulations and was directly contradicted by Defendants' own risk assessment of Plaintiffs' account.

347.   **A. Violations of Mastercard Security Rules and Procedures (SPME Manual)**

348.   **Timing Violation:** The placement was untimely. Mastercard Security Rules and Procedures (SPME Manual) § 11.2.2 **(Exhibit 34)** require an acquiring bank to add a

merchant to MATCH "within five calendar days" of the termination decision. Defendants terminated Plaintiffs' account on November 20, 2025, but did not place them on MATCH until December 4, 2025, fourteen (14) days later, nearly triple the allowed time. This delay demonstrates the placement was not a contemporaneous risk-based decision but an afterthought.

349.    **No Qualifying Reason Code:** The placement lacked a valid basis. Mastercard Security Rules and Procedures (SPME Manual) § 11.2.3 and Table 11.4 **(Exhibit 34)** require that one of fourteen specific reason codes be met or suspected to justify a MATCH placement. Those codes are: (01) Account Data Compromise; (02) Common Point of Purchase; (03) Laundering; (04) Excessive Chargebacks; (05) Excessive Fraud; (06) Reserved; (07) Fraud Conviction; (08) Questionable Merchant Audit Program; (09) Bankruptcy/Liquidation/Insolvency; (10) Violation of Standards; (11) Merchant Collusion; (12) PCI DSS Non-Compliance; (13) Illegal Transactions; and (14) Identity Theft.

350.    None of these fourteen conditions existed or were ever suspected by Defendants at the time of termination. The stated reason for termination was a contractual dispute over "multiple processors," which is not a valid MATCH reason code. This was confirmed by Defendants' own actions, including releasing all funds with a $0 reserve and their risk analyst's assessment that the account was "historically healthy."

351.    **Failure to Investigate:** The placement was made without a reasonable investigation. Mastercard Security Rules and Procedures (SPME Manual) require acquiring banks to "act diligently, reasonably, and in good faith." Defendants failed to do so, as evidenced by the fact they were forced to reverse the MATCH placement just eight days later after Plaintiffs provided evidence of its impropriety.

352.    **Improper Use as a Retaliation Tool:** The placement was a punitive measure. Mastercard Security Rules and Procedures (SPME Manual) § 11.2.3 **(Exhibit 34)** expressly prohibit an acquirer from using or threatening to use MATCH "as a collection tool for minor Merchant discretionary activity." Defendants weaponized the MATCH

system as a tool of retaliation for a simple contractual dispute, not for any legitimate risk management purpose.

353. **Admission of Error Through Reversal:** The reversal itself is an admission of falsity. Under Mastercard Security Rules and Procedures (SPME Manual) § 11.4 **(Exhibit 34)**, a merchant can only be removed from MATCH if the acquirer reports to Mastercard that it "added the Merchant to MATCH in error." On December 12, 2025, Defendants removed Plaintiffs from the MATCH list, thereby admitting under the regulations that the initial placement was erroneous.

354. **B. Defendants' Own Risk Assessment Contradicted the Placement**

355. Defendants' own contemporaneous conduct and communications demonstrate they knew the MATCH placement was baseless:

a. **$0 Reserve Fund:** On November 20, 2025, the date of termination, Defendants released all of Plaintiffs' funds and held a reserve of $0. This action is fundamentally inconsistent with any genuine belief that Plaintiffs posed a financial risk warranting a MATCH listing.

b. **"Historically Healthy" Assessment:** On December 2, 2025, just two days before the MATCH placement, Worldpay's Credit Risk Analyst, Kennedy Usoro, stated in a phone call with Ms. Osborne that the account was "historically healthy" and that Plaintiffs were "not high-risk."

c. **Rapid Reversal:** On December 9, 2025, after pressure from Plaintiffs, Defendants confirmed through their agent Stax, "I have submitted the request to have your account removed from MATCH." **(Exhibit 21)**. Three days later, on December 12, 2025, they provided a screenshot confirming "Success! Merchant UNIFIED GROWTH has been successfully deleted" from the MATCH system. **(Exhibit 19)**. The rapid eight-day reversal underscores that the placement was improper from the outset.

## VI. Defendants Acted With Actual Malice

356. Defendants published the defamatory MATCH placement with actual malice, that is, with knowledge of its falsity or with reckless disregard for its truth or falsity.

357. **Knowledge of Falsity:** Defendants knew the statement was false when they made it. This knowledge is evidenced by: (a) the $0 reserve fund established at termination, indicating no perceived financial risk; (b) the "historically healthy" and "not high-risk" assessment of the account by their own risk analyst just two days before the placement; (c) the complete absence of any of the fourteen qualifying Mastercard reason codes; and (d) the rapid reversal of the placement, which serves as an admission of error.

358. **Reckless Disregard for the Truth:** Alternatively, Defendants acted with reckless disregard for the truth by: (a) failing to conduct any adequate or reasonable investigation before blacklisting Plaintiffs; (b) deliberately ignoring the overwhelming evidence that Plaintiffs were not high-risk; (c) placing Plaintiffs on MATCH fourteen days after termination as a punitive afterthought, not as a contemporaneous risk assessment; and (d) using the MATCH system as a weapon of retaliation in a contractual dispute, a purpose for which it was never intended.

359. **Improper Motive and Override by "Upper Management":** The decision was not a good-faith error but a deliberate act of malice. On December 5, 2025, Worldpay's risk analyst, Kennedy Usoro, admitted to Ms. Osborne that the MATCH placement decision was merely "procedural" and had been made by "upper management." This statement reveals that Defendants' leadership overrode their own risk analyst's favorable assessment and made the decision for improper, punitive purposes rather than for legitimate risk management.

## *VII. Rebuttal of Qualified Privilege*

360. To the extent Defendants assert that the MATCH publication is subject to a common-law qualified privilege on the theory that Mastercard, acquiring banks, and payment processors share a common interest in risk communications, the privilege is defeated here. Specifically: (a) Defendants published the statement with actual malice for the reasons set forth above; (b) Defendants acted with an improper purpose, namely retaliation for Plaintiffs' exercise of their lawful right to use competing processors, which

is outside the scope of any purpose the privilege exists to protect; (c) the MATCH system is not a confidential business communication among parties with a narrow common interest but a compulsory industry blacklist broadcast to every acquiring bank and payment processor globally; and (d) Defendants' publication exceeded any scope of privilege because the stated reason ("multiple processors") is not a MATCH-eligible reason code under Mastercard Security Rules and Procedures § 11.2.3 and Table 11.4. Any qualified privilege that might otherwise apply is defeated.

## VIII. Damages

361.  Because the MATCH placement is defamatory per se, damages are presumed under Colorado law. The statement is so inherently damaging that Plaintiffs need not plead or prove special damages.

362.  As a direct and proximate result of Defendants' defamatory publication, Plaintiffs have also suffered extensive actual damages, including but not limited to loss of business relationships (the immediate termination of merchant accounts for affiliated companies Ad Depot LLC and Gonzy Limited by Stripe **(Exhibits 16, 17)**), inability to obtain new merchant processing accounts from other providers who saw the MATCH listing, severe and lasting reputational harm, significant emotional distress suffered by Ms. Osborne, lost revenue and increased costs, and a substantial diminishment of business value and goodwill.

363.  **Reservation of Exemplary Damages.** Plaintiffs reserve their right, pursuant to C.R.S. § 13-21-102(1.5)(a), to seek leave to amend this Complaint to add a claim for exemplary damages after the exchange of initial disclosures under Fed. R. Civ. P. 26 and upon a prima facie showing of a triable issue.

## COUNT VII: FRAUD / FRAUDULENT MISREPRESENTATION

### (Asserted by Unified Growth, Inc. against Defendants Worldpay ISO Inc. and Fattmerchant, Inc. d/b/a Stax Payments)

364. Plaintiff Unified Growth, Inc. incorporates by reference paragraphs 25 through 207 of the Facts Common to All Counts as if fully set forth herein.

## *I. Parties and Agency*

365. Defendant Stax Payments, f/k/a Fattmerchant, Inc. ("Stax") is the entity that made the fraudulent misrepresentation at issue.

366. Defendant Worldpay ISO Inc. ("Worldpay") is liable for Stax's fraud under the doctrines of **apparent authority** and **ratification.**

367. **Apparent Authority:** For six years, Worldpay held Stax out to Plaintiff as its authorized representative for all merchant account communications and customer service. Plaintiff reasonably and justifiably relied on Stax as Worldpay's representative.

368. **Ratification:** Alternatively, Worldpay ratified Stax's fraud. On or about July 8, 2025, during the risk review, Worldpay learned of Stax's failure to process the update and the resulting business disruption. Instead of repudiating Stax's conduct or correcting the harm, Worldpay approved the account to "continue to process as normal," thereby accepting and retaining the benefits of the fraudulent concealment (i.e., keeping Plaintiff as a customer). By knowingly retaining the benefits of its agent's fraud, Worldpay ratified it.

## *II. The False Representation of Material Fact*

369. On June 3, 2025, Melissa Baar, a manager at Defendant Stax, sent an email from Florida to Plaintiff's principal, Danelle Osborne, in Colorado, containing a false representation of material fact. The email stated: "All payments are being processed with no problems." **(Exhibit 2).**

370. This statement was false. At the time Ms. Baar made this representation, payments were not being processed with no problems. In fact: (a) Stax had failed to transmit Plaintiff's March 25, 2025 bank account update request to Worldpay; (b) as a direct result of this failure, payments were being rejected due to the outdated bank account information; and

(c) a catastrophic $394,538.19 funding hold had been placed or was about to be placed on Plaintiff's account due to ACH rejections caused by the failed bank account update.

### III. Knowledge of Falsity (Scienter)

371.   Defendant Stax, through its manager Melissa Baar, made the false statement with **actual knowledge of its falsity** or with a **conscious and deliberate disregard for its truth.**

372.   **Conscious Disregard:** Standard industry practice, and the basic duties of a payment processor, require that a customer service manager like Ms. Baar must verify that a critical account change has been successfully processed and confirmed by the upstream processor (Worldpay) before representing to a merchant that there are "no problems." By making the affirmative statement without performing this basic, critical verification step, Ms. Baar consciously disregarded the high probability that her statement was false.

373.   **Actual Knowledge:** It is a reasonable and strong inference that Stax received automated notifications from Worldpay's system between March 25 and June 3, 2025, indicating that ACH transfers to Plaintiff's old account had been rejected. As Manager of Accounts Receivable, Ms. Baar was either the direct recipient of these failure notices or had a duty to review them. Her statement that there were "no problems" in the face of these system-generated failure notices demonstrates actual knowledge of its falsity.

374.   **Motive to Deceive:** Stax's motive for the fraudulent misrepresentation was to conceal its own administrative failure in not processing the bank account update, thereby avoiding immediate liability and preventing Plaintiff from escalating the issue to Worldpay.

375.   **Further Evidence of Knowledge:** This knowledge is further evidenced by the fact that on July 8, 2025, Worldpay's Credit Risk Analyst, Kennedy Usoro, confirmed that Worldpay had "never heard back" from Stax despite repeated attempts to contact them about the bank account update **(Exhibit 6)**, proving that Stax's internal records would have shown no confirmation from Worldpay as of June 3, 2025.

### IV. Intent to Induce Reliance

376.   Defendant Stax made this false statement with the intent to induce Plaintiff to continue operating its business without seeking alternative payment processors, to continue processing transactions through Stax/Worldpay, to not escalate the bank account update issue directly to Worldpay, and to remain dependent on Stax/Worldpay for payment processing services.

### V. Justifiable Reliance

377.   Plaintiff justifiably relied on Ms. Baar's false representation. In reliance on the statement, Plaintiff continued to operate its business, did not escalate the bank account update inquiry directly to Worldpay, continued to process transactions through Stax/Worldpay, and did not take immediate protective measures to secure backup payment processing arrangements.

378.   Plaintiff's reliance was particularly justifiable in this context because: (a) Plaintiff had no direct access to Worldpay's internal systems to verify whether the bank account update had been processed; (b) when a manager at a payment processor affirmatively states that "all payments are being processed with no problems," it is commercially reasonable for a merchant to rely on that statement; and (c) the very purpose of the fraudulent misrepresentation was to prevent Plaintiff from discovering the truth and escalating the issue to Worldpay. The fraud succeeded in its purpose for 35 days (June 3 to July 8, 2025), during which time the damage was done.

### VI. Causation: A Single, Unbroken Chain of Events

379.   The entirety of Plaintiff's damages were the direct and foreseeable result of the initial fraudulent misrepresentation, which set in motion a single, unbroken chain of events. The fraudulent scheme unfolded in two foreseeable stages.

380.   **Stage 1:** The Initial Fraud and Foreseeable Consequences (June-July 2025). Defendants' June 3rd fraud was intended to, and did, conceal their failure to process the bank account update. It was entirely foreseeable that this concealment would lead to a catastrophic funding hold, and that a prudent merchant, having lost all confidence in its processor's basic competence, would be forced to diversify to other processors to ensure business

survival. This diversification was not an independent choice; it was a direct and necessary consequence of the initial fraud.

381.    **Stage 2:** The Exploitation of the Consequences (November-December 2025). After Plaintiff's processing volume with Defendants subsequently dropped (a direct result of the forced diversification), Defendants wrongfully seized upon the very diversification they had caused as a pretext to terminate the relationship. The wrongful termination and subsequent defamatory MATCH placement were not intervening events; they were the culmination of the initial fraud, allowing Defendants to exit a less-profitable relationship by weaponizing the foreseeable consequences of their own misconduct.

## VII. Damages

382.    As a direct and proximate result of Defendants' fraudulent misrepresentation, Plaintiff has suffered damages in an amount to be proven at trial, but which is believed to exceed $8,500,000, including but not limited to: (a) the $394,538.19 funding hold that was directly caused and prolonged by Stax's June 3, 2025 misrepresentation; (b) $180,000 in emergency financing costs incurred to survive the funding hold crisis; (c) lost revenue from business disruption caused by the funding hold and subsequent forced diversification to multiple processors; (d) an inability to obtain new merchant processing accounts; (e) severe and lasting reputational harm in the payment processing industry; (f) a substantial diminishment of business value and goodwill; and (g) ongoing business disruption and lost opportunities.

383.    **Reservation of Exemplary Damages.** Plaintiff reserves its right, pursuant to C.R.S. § 13-21-102(1.5)(a), to seek leave to amend this Complaint to add a claim for exemplary damages after the exchange of initial disclosures under Fed. R. Civ. P. 26 and upon a prima facie showing of a triable issue.

## COUNT VIII: FRAUDULENT INDUCEMENT OF THE ARBITRATION CLAUSE AND UNCONSCIONABILITY

**(Asserted by Danelle Osborne and Unified Growth, Inc. against Worldpay ISO Inc., Fifth Third Bank, N.A., and Fattmerchant, Inc. d/b/a Stax Payments)**

384. Plaintiffs Danelle Osborne and Unified Growth, Inc. incorporate by reference paragraphs 25 through 207 of the Facts Common to All Counts as if fully set forth herein.

385. This Count alleges that Defendants fraudulently induced Plaintiffs to assent to the arbitration clause contained in Section 12.L of the 34-Page Terms **(Exhibit 20A)**, and, independently, that the arbitration clause is unconscionable under generally applicable Colorado contract law. Plaintiffs do not seek rescission of the Merchant Processing Agreement and do not dispute that a commercial relationship existed. Plaintiffs challenge only whether they knowingly and voluntarily assented to the arbitration provision, including its forum, cost-shifting, and delegation effects. Because this claim is directed specifically to the formation and enforceability of the agreement to arbitrate, it is a gateway issue for the Court, not an arbitrator, to decide. *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 70-71 (2010); *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403-04 (1967).

386. **Challenge Specifically Directed to the Arbitration Clause.** This Count is specifically and exclusively directed to the formation and enforceability of the arbitration clause contained in Section 12.L of the 34-Page Terms. Plaintiffs challenge the arbitration clause on grounds applicable to the arbitration clause itself, including (a) that Defendants' concealment was specifically calculated to prevent Plaintiffs' discovery of and assent to the arbitration clause, and (b) that the arbitration clause is independently unconscionable on the terms pleaded below.

## A. The False Representation of Material Fact

387. On September 4, 2019, during a conference call with Defendants through their agent Sid Masso, a Stax Senior Payment Consultant, Defendants presented Plaintiffs with a six-page document titled "Merchant Processing Agreement" (the "6-Page Agreement").

388. Page 6 of the 6-Page Agreement, which Plaintiffs signed, contained a prominent graphic titled "The fatt PROMISE" which represented that the service included "NO CONTRACT," was "month-to-month," had "no strings attached," and was a "completely transparent system." **(Exhibit 20, p. 6).**

389.   The "NO CONTRACT" representation was prominently displayed in a large, colorful graphic occupying approximately one-third of page 6 of the 6-Page Agreement. The graphic featured the Fattmerchant logo, a circular badge with the text "SIMPLE PROCESSING" and "FATT SAVINGS," bold text stating "We promise to change the credit card processing game by introducing a flat-rate, month-to-month, no strings attached, and completely transparent system that allows merchants to gain access to simple credit card processing," five bullet points, and the signature of "Suneera Madhani, CEO/Founder" with the phrase "Just Savings!" The graphic was the most visually prominent element on the signature page, designed to be the last thing Plaintiffs saw before signing and to create a false sense of security that they were not entering a binding agreement imposing material legal restrictions on their rights.

390.   The "NO CONTRACT" representation was not qualified, explained, or limited in any way and was presented at the moment of signature as an assurance that Plaintiffs were not agreeing to binding dispute-resolution procedures or liability-limiting provisions. A reasonable merchant would understand the unqualified "NO CONTRACT" representation to mean the absence of mandatory arbitration and liability restrictions, not merely the absence of an early termination fee or fixed-term commitment. The representation was expressly designed to prevent Plaintiffs from discovering and assenting to the arbitration clause contained in the hyperlinked 34-Page Terms.

### B. Knowledge of Falsity (Scienter)

391.   At the time this representation was made, Defendants knew it was false. The 6-Page Agreement purported to incorporate by reference a 34-page document containing numerous binding and non-negotiable terms, including a mandatory arbitration clause requiring all disputes to be resolved through binding arbitration in Cincinnati, Ohio or Hamilton County, Ohio, with a 50/50 cost-sharing provision; a limitation of liability clause capping Defendants' liability at "the fees paid to us for the particular Services in question for the calendar month preceding the date of our relevant act or omission"; a disclaimer of all consequential, incidental, special, and punitive damages; a forum selection clause; an early termination fee; extensive merchant obligations and warranties; broad indemnification obligations; waiver of jury trial rights; waiver of class action

rights; a shortened one-year statute of limitations; an exclusive remedy provision; a disclaimer of all warranties; and numerous other binding terms spanning 34 pages. These terms directly contradicted the "NO CONTRACT" representation.

### C. *Intent to Induce Reliance*

392.    Defendants made the "NO CONTRACT" representation with the intent to induce Plaintiffs to rely on it, specifically to induce Plaintiffs to believe they were not entering a binding, long-form agreement containing an arbitration clause, and to discourage them from scrutinizing the hyperlinked 34-Page Terms where the arbitration clause was buried.

393.    Defendants' intent to conceal the arbitration clause is demonstrated by the following facts: (a) Defendants prominently displayed "NO CONTRACT" on one of the signature pages, the last page Plaintiffs would see before finishing signing, ensuring it would be fresh in Plaintiffs' minds; (b) Defendants buried the hyperlink to the actual contract terms on page 1, where it would be overlooked; (c) Defendants did not provide the 34-Page Terms as an attachment or separate document, requiring Plaintiffs to affirmatively click a hyperlink to access them; (d) Defendants' sales representative emphasized "NO CONTRACT" during the signing process, reinforcing the false impression; (e) Defendants' sales representative did not mention the arbitration clause, despite it being one of the most significant terms in the agreement; (f) Defendants designed the signing process to be completed in less than seven minutes, preventing Plaintiffs from having time to review the 34-Page Terms; (g) Defendants knew that the "NO CONTRACT" representation would discourage Plaintiffs from clicking the hyperlink and reviewing the terms; and (h) Defendants' business model depends on quickly signing merchants without giving them time to review onerous terms.

394.    During the September 4, 2019 conference call, Defendants' agent Sid Masso actively concealed the existence of the 34-Page Terms and the arbitration clause. Specifically: (a) the signing portion of the conference call took less than seven minutes; (b) Sid Masso stated that the agreement was "standard" and emphasized the "NO CONTRACT" representation displayed on page 6; (c) Sid Masso did not direct Plaintiffs to the hyperlink to the 34-Page Terms; (d) Sid Masso did not advise Plaintiffs to review the 34-

Page Terms; (e) Sid Masso did not mention, discuss, or otherwise disclose the existence of an arbitration clause; (f) Sid Masso did not mention, discuss, or otherwise disclose the existence of a limitation of liability provision; (g) Sid Masso did not mention, discuss, or otherwise disclose that arbitration would be in Cincinnati, Ohio; (h) Sid Masso did not mention, discuss, or otherwise disclose the 50/50 cost-sharing provision for arbitration; (i) Sid Masso did not provide Plaintiffs with a copy of the 34-Page Terms; and (j) Sid Masso did not give Plaintiffs time to review the 34-Page Terms before signing. The entire signing process was designed to be quick, simple, and to discourage any scrutiny of the incorporated terms.

### D. *Justifiable Reliance*

395.  Plaintiffs justifiably relied on the "NO CONTRACT" representation. In reliance on this statement, Plaintiffs did not click the hyperlink to the 34-Page Terms and did not review the arbitration clause before signing the 6-Page Agreement.

396.  Plaintiffs' reliance on the "NO CONTRACT" representation was justifiable under the circumstances because: (a) the representation was made by Defendants' authorized sales representative during the signing process, not in general marketing materials; (b) the representation was prominently displayed on the signature page, the last page Plaintiffs saw before signing; (c) the representation was emphasized by Defendants' sales representative during the conference call; (d) the representation was specific and unequivocal: "NO CONTRACT" means no binding legal obligations; (e) Plaintiffs had no reason to believe Defendants were lying about such a fundamental aspect of the agreement; (f) Plaintiffs had no independent duty to click a buried hyperlink and review 34 pages of terms when Defendants represented there was "NO CONTRACT"; (g) a reasonable person who is told there is "NO CONTRACT" would not expect to find a mandatory arbitration clause, limitation of liability, and other onerous terms; (h) Defendants' active concealment of the arbitration clause made it unreasonable to expect Plaintiffs to discover it; (i) the doctrine of fraud vitiates any duty to read: when a party makes a false representation designed to prevent the other party from reading the contract, the defrauded party's failure to read is not a defense; and (j) Colorado law

recognizes that reliance is justifiable when the defendant makes a false representation and takes active steps to prevent the plaintiff from discovering the truth.

### E. The Concealed Arbitration Clause Is Onerous

397.    The arbitration clause that Defendants concealed is particularly onerous and would have been a deal-breaker had Plaintiffs known of its existence: (a) it requires arbitration in Cincinnati, Ohio, over 1,000 miles from Plaintiffs' Colorado location, requiring Plaintiffs to travel out of state for all proceedings; (b) it requires Plaintiffs to pay 50% of all arbitration costs, which could exceed $50,000 for a complex commercial dispute involving multiple parties and extensive discovery; (c) combined with the limitation of liability clause capping damages at one month's fees (approximately $3,000 to $5,000), arbitration is economically futile because Plaintiffs would have to spend $50,000+ to recover at most $5,000; (d) it waives Plaintiffs' right to a jury trial, a fundamental constitutional right; (e) it waives Plaintiffs' right to litigate in their home forum (Colorado); (f) it waives Plaintiffs' right to participate in a class action; (g) it gives Defendants a significant strategic advantage by forcing Plaintiffs to arbitrate in Defendants' home forum (Cincinnati, Ohio) at prohibitive cost; and (h) Defendants knew that the arbitration clause, if disclosed, would deter merchants from signing the agreement, which is why Defendants concealed it behind the "NO CONTRACT" representation. Had Plaintiffs known of the arbitration clause, they would not have signed the agreement.

### F. Causation and Damages

398.    As a direct and proximate result of Defendants' fraudulent inducement specifically directed at the formation of the agreement to arbitrate, Plaintiffs suffered damages including: (a) loss of right to jury trial; (b) loss of right to litigate in their home forum; (c) subjection to prohibitive arbitration costs under the 50/50 cost-sharing provision; (d) economic futility because the combination of the arbitration clause and the liability cap makes pursuing their claims economically impossible; (e) substantial attorneys' fees incurred to resist Defendants' anticipated motion to compel arbitration and to litigate the fraudulent inducement of the arbitration clause; and (f) but for Defendants' fraudulent

"NO CONTRACT" representation, Plaintiffs would have clicked the hyperlink, reviewed the 34-Page Terms, discovered the arbitration clause, and refused to sign the agreement.

### G. Unconscionability of the Arbitration Clause as an Independent Basis for Relief

399. Independent of the fraudulent inducement theory, the arbitration clause is unconscionable and unenforceable as a matter of Colorado contract law applicable to all contracts, as permitted by *Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681 (1996), and is therefore invalid under 9 U.S.C. § 2. The arbitration clause is procedurally unconscionable because the 34-Page Terms were not provided to Plaintiffs, the hyperlink was buried and later non-functional, the signing process was compressed to seven minutes, and Defendants held superior bargaining power. The arbitration clause is substantively unconscionable because the 50/50 cost-sharing provision, the Hamilton County, Ohio forum selection, the combined effect with the Section 9.B liability cap rendering arbitration economically futile, and the shortened one-year limitations period make the provision unenforceable. The arbitration clause should be severed from the remainder of the Merchant Processing Agreement and declared unenforceable.

400. **Reservation of Exemplary Damages.** Plaintiffs reserve their right, pursuant to C.R.S. § 13-21-102(1.5)(a), to seek leave to amend this Complaint to add a claim for exemplary damages after the exchange of initial disclosures under Fed. R. Civ. P. 26 and upon a prima facie showing of a triable issue.

## COUNT IX: VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (CIVIL RICO), 18 U.S.C. §§ 1962(c) AND (d)

### (Asserted by Unified Growth, Inc. and Danelle Osborne against all Defendants)

401. Plaintiffs Unified Growth, Inc. and Danelle Osborne incorporate by reference paragraphs 25 through 207 of the Facts Common to All Counts as if fully set forth herein.

### I. Statutory Framework

402. **18 U.S.C. § 1962(c) makes it unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign**

commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

403.   18 U.S.C. § 1962(d) makes it unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c).

404.   18 U.S.C. § 1964(c) provides a private right of action for any person injured in his business or property by reason of a violation of § 1962, and entitles a prevailing plaintiff to threefold damages, costs, and reasonable attorney's fees.

## *II. The Enterprise*

405.   **Association-in-Fact Enterprise.** At all times relevant, Defendants Fattmerchant, Inc. d/b/a Stax Payments, Worldpay ISO Inc., and Fifth Third Bank, N.A. constituted an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) (the "Payment Processing Enterprise"). The Payment Processing Enterprise is an ongoing organization, with a common purpose of soliciting, onboarding, processing, and monetizing merchant payment processing relationships. Its members function as a continuing unit. The Payment Processing Enterprise is distinct from each individual Defendant. *See Boyle v. United States*, 556 U.S. 938 (2009); *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158 (2001).

406.   **Structure of the Enterprise.** Within the Payment Processing Enterprise, each Defendant played a distinct and coordinated role: (a) Stax functioned as the solicitation, customer-service, and account-management arm, serving as the primary point of contact for merchants; (b) Worldpay ISO functioned as the transaction processor and risk assessor; and (c) Fifth Third Bank functioned as the Member Bank and regulatory gatekeeper, holding the non-delegable Member Bank responsibilities set forth in the Mastercard Rules and the 6-Page Agreement, including sole authority to submit MATCH placements. The Enterprise's structure and common purpose are further evidenced by the 6-Page Agreement and the 34-Page Terms, which integrate the three Defendants into a unified merchant-facing operation.

407.   **Interstate Commerce.** The Payment Processing Enterprise is engaged in, and its activities affect, interstate commerce. The Enterprise processes payments between

merchants and cardholders across state lines, transmits communications across state lines (including between Colorado, Florida, Nebraska, and Ohio), and participates in the interstate Mastercard payment network.

### *III. Pattern of Racketeering Activity*

408. Each Defendant engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5), consisting of multiple related predicate acts of wire fraud in violation of 18 U.S.C. § 1343 and mail fraud in violation of 18 U.S.C. § 1341, committed within the applicable ten-year period.

409. Predicate Act 1: 2019 Fraudulent Inducement Scheme. On September 4, 2019, Defendants, acting through Stax representative Sid Masso and using interstate wire communications (including the conference call and associated emails between Colorado and Defendants' out-of-state offices), caused to be transmitted the 6-Page Agreement, which prominently displayed the "NO CONTRACT" representation while concealing the 34-Page Terms containing the arbitration clause, limitation of liability, exclusivity provision, and other binding terms. The interstate transmission of these materially false representations constituted wire fraud under 18 U.S.C. § 1343.

410. Predicate Act 2: June 3, 2025 Concealment. On June 3, 2025, Stax manager Melissa Baar, acting for and on behalf of the Enterprise, sent an email from Florida to Plaintiffs in Colorado stating "all payments are being processed with no problems," at a time when she knew or recklessly disregarded that the March 2025 bank account update had not been transmitted, ACH transfers were being rejected, and a funding hold was imminent. This interstate wire communication, made with intent to deceive and to induce continued reliance on the Enterprise's services, constituted wire fraud under § 1343.

411. Predicate Act 3: July 10, 2025 False Risk Approval. On July 10, 2025, Worldpay Credit Risk Analyst Kennedy Usoro, acting for and on behalf of the Enterprise, sent an email from Ohio to Plaintiffs in Colorado stating "no further action is required" and "the business may continue to process as normal," knowing or recklessly

disregarding that the Merchant Processing Agreement contained an exclusivity provision restricting multiple processors, that Plaintiffs were using multiple processors, and that Worldpay would later invoke this exclusivity provision to terminate. This interstate wire communication, intended to induce Plaintiffs' continued reliance and to preserve the Enterprise's ability to terminate at a future time of its choosing, constituted wire fraud under § 1343.

412. **Predicate Act 4: November 12, 2025 Pretextual Demand.** On November 12, 2025, Stax manager Meredith Jackson, acting for and on behalf of the Enterprise, sent an email from Florida to Plaintiffs in Colorado demanding that Plaintiffs "cancel the other processor account" on pretextual grounds that contradicted Mr. Usoro's July 10, 2025 approval. This interstate wire communication, made in furtherance of the Enterprise's scheme to manufacture a pretext for termination, constituted wire fraud under § 1343.

413. **Predicate Act 5: December 4, 2025 Defamatory MATCH Publication.** On December 4, 2025, Defendants, acting in concert, caused the submission of a knowingly false MATCH placement identifying Unified Growth and Danelle Osborne as terminated high-risk merchants. This placement was transmitted by interstate wire through the Mastercard MATCH system, which operates on interstate networks accessible to payment processors nationwide. The placement was knowingly false, as confirmed by (a) the $0 reserve held on November 20, 2025; (b) Mr. Usoro's December 2, 2025 assessment that the account was "historically healthy" and "not high-risk"; (c) the absence of any valid MATCH reason code; and (d) the rapid eight-day reversal on December 12, 2025. The interstate wire transmission of this knowingly false communication constituted wire fraud under § 1343.

414. **Continuity.** The predicate acts span more than six years (September 2019 through December 2025) and reflect multiple distinct schemes (the arbitration concealment scheme, the bank account update fraud and cover-up, the false risk approval, and the retaliatory MATCH scheme). Each scheme advanced the Enterprise's common purpose. This pattern satisfies closed-end continuity under *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229 (1989). Alternatively, the pattern demonstrates open-end

continuity because Defendants' conduct is a regular way of doing business within the Payment Processing Enterprise.

### IV. Conduct of the Enterprise's Affairs

415. Each Defendant "conducted or participated, directly or indirectly, in the conduct of [the] enterprise's affairs" within the meaning of *Reves v. Ernst & Young*, 507 U.S. 170 (1993). Stax conducted the affairs of the Enterprise by soliciting merchants (including Plaintiffs), executing contracts, serving as customer-service point of contact, managing account updates, and transmitting the misrepresentations alleged above. Worldpay conducted the affairs of the Enterprise by processing transactions, conducting risk reviews, issuing and releasing funding holds, and transmitting the misrepresentations alleged above. Fifth Third conducted the affairs of the Enterprise by exercising non-delegable Member Bank responsibilities, including authorizing the MATCH placement on December 4, 2025 and subsequently authorizing its reversal on December 12, 2025, which actions could only be undertaken by the Member Bank.

### V. Conspiracy Under § 1962(d)

416. Each Defendant entered into an agreement with the other Defendants to conduct the affairs of the Payment Processing Enterprise through a pattern of racketeering activity. The existence of the agreement is evidenced by the coordinated conduct alleged herein, including the coordinated termination and MATCH placement decision made by "upper management," the coordinated failure to process the bank account update, the issuance of the funding hold, and the subsequent coordinated reversal of the hold.

### VI. Injury to Business or Property

417. Plaintiffs Unified Growth and Danelle Osborne were injured in their business and property by reason of the violations of §§ 1962(c) and (d), including without limitation: (a) the $394,538.19 funding hold; (b) $680,000 in emergency financing costs; (c) approximately $4,000,000 in lost revenue; (d) lost business opportunities and diminished enterprise value; and (e) injuries to Ms. Osborne's business and property

as personal guarantor of the Merchant Processing Agreement and principal owner of Unified Growth.

## *VII. Proximate Causation*

418. The injuries alleged were proximately caused by the pattern of racketeering activity. Each predicate act set in motion a foreseeable chain of events leading directly to Plaintiffs' injuries. *See Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258 (1992); *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006). The causation chain is direct: the 2019 concealment of the 34-Page Terms induced signing; the June 3, 2025 misrepresentation concealed the funding hold crisis; the July 10, 2025 false approval induced continued reliance on a structure Defendants later invoked against Plaintiffs; and the December 4, 2025 MATCH placement directly caused the termination of Stripe accounts and industry-wide blacklisting.

## *VIII. Damages Under This Count*

419. Plaintiffs are entitled to threefold damages under 18 U.S.C. § 1964(c) in an amount to be proven at trial but believed to exceed $25,500,000 (treble of $8,500,000), plus costs of suit and reasonable attorney's fees.

## COUNT X: VIOLATIONS OF THE FAIR CREDIT REPORTING ACT, 15 U.S.C. §§ 1681 et seq.

### (Asserted by Plaintiff Danelle Osborne individually against all Defendants)

420. Plaintiff Danelle Osborne incorporates by reference paragraphs 25 through 207 of the Facts Common to All Counts as if fully set forth herein.

421. **Personal Information Reported.** The MATCH placement of December 4, 2025 captured and transmitted to third parties (Mastercard, acquiring banks, and downstream payment processors) personal identifying information about Ms. Osborne as an individual consumer, including her legal name, date of birth, home address, telephone number, email address, and government identification information.

422. **Consumer Report.** The MATCH placement, to the extent it conveyed information bearing on Ms. Osborne's character, general reputation, personal characteristics, and mode of living, and was used or expected to be used for purposes of establishing eligibility for credit, insurance, employment, or another permissible purpose under 15 U.S.C. § 1681b, constituted a "consumer report" within the meaning of 15 U.S.C. § 1681a(d)(1). Third-party payment processors (including Stripe) used the MATCH information about Ms. Osborne to deny her continued access to payment processing services for businesses of which she is principal, which affected her personal creditworthiness and economic standing.

423. **Furnisher Status.** Defendants Fifth Third Bank (as the entity that submitted the MATCH placement), Worldpay ISO (which directed the submission), and Fattmerchant d/b/a Stax Payments (which participated in the decision) are "furnishers of information" within the meaning of 15 U.S.C. § 1681s-2.

424. **Violation of 15 U.S.C. § 1681s-2(a).** Defendants violated 15 U.S.C. § 1681s-2(a)(1)(A) by furnishing to Mastercard information relating to Ms. Osborne that Defendants knew or had reasonable cause to believe was inaccurate. The falsity of the MATCH placement is established by (a) the absence of any valid Mastercard reason code; (b) the $0 reserve held on November 20, 2025; (c) Mr. Usoro's December 2, 2025 assessment that the account was "historically healthy" and "not high-risk"; and (d) the rapid eight-day reversal on December 12, 2025.

425. **Violation of 15 U.S.C. § 1681s-2(b).** Upon notice of dispute, including through the communications exchanged between December 5 and December 12, 2025, Defendants had a duty under 15 U.S.C. § 1681s-2(b) to conduct a reasonable investigation, to review all relevant information, and to correct inaccurate information. While Defendants ultimately reversed the listing on December 12, 2025, they failed to conduct a reasonable contemporaneous investigation before the initial placement, failed to provide adequate notice of the investigation and its outcome, and failed to issue retraction or corrective notices to third parties (including Stripe) who had terminated business relationships based on the erroneous placement.

426.    **Willfulness.** Defendants' violations were willful within the meaning of 15 U.S.C. § 1681n. Defendants knew, based on their own internal assessments, that the MATCH placement was not supported by a valid reason code and did not reflect genuine risk. The rapid eight-day reversal and removal from MATCH, coupled with Mr. Usoro's prior assessment, establishes that Defendants either had actual knowledge of falsity or acted in reckless disregard of truth. *See Safeco Ins. Co. v. Burr*, 551 U.S. 47 (2007).

427.    **Alternative Negligent Violation.** In the alternative, to the extent any violation was not willful, Defendants' violations were negligent within the meaning of 15 U.S.C. § 1681o.

428.    **Damages.** As a direct and proximate result of Defendants' willful and/or negligent violations of FCRA, Ms. Osborne suffered actual damages, including but not limited to reputational harm, loss of business opportunities flowing through entities of which she is principal, severe emotional distress, anxiety, insomnia, weight loss, and the cost of medical treatment. Ms. Osborne seeks: (a) actual damages under § 1681n(a)(1)(A) and § 1681o(a)(1); (b) statutory damages under § 1681n(a)(1)(A) in the amount of up to $1,000 per violation; (c) punitive damages under § 1681n(a)(2), as federally authorized and therefore not subject to C.R.S. § 13-21-102(1.5)(a); (d) costs and reasonable attorney's fees under § 1681n(a)(3) and § 1681o(a)(2); and (e) injunctive relief requiring Defendants to issue written retractions and confirmation of expungement to all third parties who received the MATCH communication.

## COUNT XI: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (OUTRAGEOUS CONDUCT)

### (Asserted by Plaintiff Danelle Osborne individually against all Defendants)

429.    Plaintiff Danelle Osborne incorporates by reference paragraphs 25 through 207 of the Facts Common to All Counts as if fully set forth herein.

430.    **Elements.** Under Colorado law, intentional infliction of emotional distress (outrageous conduct) requires: (a) extreme and outrageous conduct by the defendant; (b) intent or reckless disregard as to the probability of causing severe emotional distress; and (c) resulting severe emotional distress to the plaintiff. *See Rugg v.*

*McCarty*, 476 P.2d 753 (Colo. 1970); *Coors Brewing Co. v. Floyd*, 978 P.2d 663 (Colo. 1999).

431. **Extreme and Outrageous Conduct.** Defendants' conduct was extreme and outrageous, exceeding all bounds of decency and intolerable in a civilized society, including: (a) knowingly placing Ms. Osborne individually, by name and with her personal identifying information, on an industry-wide blacklist (MATCH) designed to identify fraudsters, money launderers, and other bad actors, when Defendants' own contemporaneous risk assessment described the account as "historically healthy" and "not high-risk"; (b) using the MATCH system as a weapon of retaliation for a contractual dispute, for a reason ("multiple processors") that does not correspond to any valid Mastercard MATCH reason code; (c) releasing all funds with $0 reserves, thereby confirming Defendants' own belief that Ms. Osborne posed no financial risk, and nevertheless proceeding with the MATCH placement fourteen days after termination as a delayed punitive measure; (d) abusing their position of superior power, as a national bank, payment processor, and ISO, to inflict catastrophic reputational, financial, and personal harm on a Colorado merchant who had a six-year history of timely performance; and (e) engaging in a pattern of deception that spanned six years, including the 2019 concealment of the arbitration clause, the June 2025 misrepresentation of account status, the July 2025 false approval of multiple processors, and the November 2025 pretextual invocation of the same issue as a basis for termination.

432. **Intent or Reckless Disregard.** Defendants' conduct was intentional or, at minimum, undertaken in reckless disregard of the probability that it would cause severe emotional distress to Ms. Osborne. Defendants knew Ms. Osborne was the principal owner of multiple businesses whose merchant processing would be immediately terminated upon MATCH placement; they knew the placement would be broadcast to every acquirer globally; and they knew Ms. Osborne would be personally identified by name.

433. **Severe Emotional Distress.** As a direct and proximate result of Defendants' extreme and outrageous conduct, Ms. Osborne suffered severe emotional distress, including

anxiety, insomnia, loss of appetite, a twenty-pound weight loss, and the need for formal medical treatment at a Veterans Affairs Hospital in December 2025. These manifestations exceed ordinary stress and are medically documented.

434.    **Independent Duty and Physical Injury Exception to Economic Loss Rule.** The duty to refrain from extreme and outrageous conduct causing severe emotional distress is independent of any contractual duty owed under the Merchant Processing Agreement. Furthermore, Ms. Osborne's physical injury and medically documented condition bring this claim within the physical injury exception to the economic loss rule. *See Town of Alma v. AZCO Construction, Inc.,* 10 P.3d 1256 (Colo. 2000).

435.    **Damages.** Ms. Osborne seeks compensatory damages for her severe emotional distress, physical injury, medical treatment costs, and associated harm, in an amount to be proven at trial.

436.    **Reservation of Exemplary Damages.** Plaintiff reserves her right, pursuant to C.R.S. § 13-21-102(1.5)(a), to seek leave to amend this Complaint to add a claim for exemplary damages after the exchange of initial disclosures under Fed. R. Civ. P. 26 and upon a prima facie showing of a triable issue.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, jointly and severally, and award the following relief:

### A. Compensatory Damages for Unified Growth, Inc. and Danelle Osborne

For an award of compensatory damages in an amount to be proven at trial, but believed to exceed **$8,500,000**, arising from all counts asserted by these Plaintiffs, including but not limited to: all direct and consequential damages resulting from the $394,538.19 funding hold imposed in June-July 2025; lost revenues and profits exceeding $4,000,000; emergency financing costs of at least $680,000, including $180,000 in lines of credit and a $500,000 Home Equity Line of Credit secured against Ms. Osborne's personal residence; workforce reduction costs; operational inefficiency costs from being forced to diversify to multiple payment processors; executive

opportunity cost from the diversion of executive time and resources from revenue-generating activities to crisis management from June 2025 through present; complete destruction of Unified Growth's enterprise value and going concern value; permanent impairment of Danelle Osborne's professional reputation and future earning capacity from the MATCH placement, which persists even after reversal; damages for Danelle Osborne's personal physical injury and emotional distress, including 20-pound weight loss, anxiety, insomnia, and need for medical treatment; increased merchant processing fees due to "high-risk" classification following the MATCH placement; reputational harm and diminished goodwill for Unified Growth and Ms. Osborne; and all other economic and non-economic losses directly and proximately caused by Defendants' conduct.

### A.1. Treble Damages Under 18 U.S.C. § 1964(c)

For an award of treble damages in an amount to be proven at trial but believed to exceed **$25,500,000**, plus costs of suit and reasonable attorney's fees, under Count IX (Civil RICO).

### B. Compensatory Damages for Gonzy Limited and Ad Depot LLC

For an award of compensatory damages in an amount to be proven at trial, but believed to exceed **$1,000,000**, arising from Count I (Negligence) and Count III (Tortious Interference with Business Relationships), including but not limited to: lost revenues from the immediate termination of their Stripe merchant accounts on December 4 and December 6, 2025, which explicitly cited the MATCH placement as the sole reason for termination; complete loss of ability to process credit card payments from December 2025 through the present; complete destruction of business value and goodwill for both entities; loss of customer relationships and ongoing business opportunities; reputational harm within the payment processing industry; and all other economic losses directly and proximately caused by Defendants' wrongful MATCH placement.

### C. Presumed Damages and FCRA Damages

For an award of presumed damages for defamation per se (Count VI) pursuant to Colorado law, in an amount to be determined by the jury, based on the MATCH placement that imputed unfitness to engage in business and want of integrity in the discharge of business duties.

For an award of actual damages, statutory damages of up to $1,000 per violation, punitive damages, costs, and reasonable attorney's fees under 15 U.S.C. §§ 1681n and 1681o (Count X).

### D. Reservation of Exemplary Damages

Plaintiffs reserve their right, pursuant to C.R.S. § 13-21-102(1.5)(a), to seek leave to amend this Complaint to add a claim for exemplary damages on Counts I through VIII and Count XI after the exchange of initial disclosures under Fed. R. Civ. P. 26 and upon a prima facie showing of a triable issue. This reservation does not apply to the punitive damages sought under Count X pursuant to 15 U.S.C. § 1681n(a)(2), which are authorized by federal statute and not subject to the Colorado pleading restriction.

### E. Declaratory Relief

For a declaratory judgment pursuant to 28 U.S.C. § 2201 that: (a) the arbitration clause contained in Section 12.L of the 34-Page Terms is unconscionable, unenforceable, and void due to fraudulent inducement; (b) the limitation of liability provisions contained in Section 9.B of the 34-Page Terms are unconscionable and unenforceable; (c) the December 4, 2025 placement of Plaintiffs on the MATCH list was wrongful, defamatory, made without a valid reason code, in violation of mandatory Mastercard Security Rules and Procedures (SPME Manual), and constituted a breach of the Merchant Agreement; (d) the November 20, 2025 termination of Plaintiffs' merchant account was wrongful and constituted a breach of the Merchant Agreement; and (e) Defendants' conduct as alleged herein constituted breaches of the Merchant Processing Agreement and the implied covenant of good faith and fair dealing, as well as tortious conduct for which Plaintiffs are entitled to relief.

### F. Injunctive Relief

For a permanent injunction requiring Defendants to: (a) expunge all adverse, inaccurate, and misleading records concerning Plaintiffs from all of Defendants' internal systems, databases, and records; (b) permanently refrain from reporting any adverse, inaccurate, or misleading information about Plaintiffs to any third party, including but not limited to Mastercard, other card brands, credit reporting agencies, financial institutions, or payment processors, based on the conduct alleged in this Complaint; (c) issue written retractions and corrections to Mastercard and

any other entity to whom Defendants reported adverse, inaccurate, or misleading information about Plaintiffs, specifically including retraction of the December 4, 2025 MATCH placement, confirmation that the MATCH placement was reversed on December 12, 2025, confirmation that Plaintiffs' account was assessed as "historically healthy" and "not high-risk" as of December 2, 2025, by Defendants' own Credit Risk Analyst, and confirmation that termination was released with $0 reserves on November 20, 2025, indicating no financial risk; and (d) provide Plaintiffs with written confirmation that all adverse information has been expunged and all retractions have been issued.

## G. Pre-Judgment and Post-Judgment Interest

For an award of pre-judgment and post-judgment interest at the highest lawful rate permitted under Colorado and federal law.

## H. Attorney's Fees

For an award of Plaintiffs' reasonable attorneys' fees and costs incurred in this action, to the extent permitted by law, contract, or statute.

## H.1. Attorney's Fees Under Federal Statutes

For an award of Plaintiffs' reasonable attorney's fees pursuant to 18 U.S.C. § 1964(c) (Count IX) and 15 U.S.C. §§ 1681n(a)(3) and 1681o(a)(2) (Count X).

## I. Costs of Suit

For an award of Plaintiffs' costs and expenses incurred in this action, including but not limited to filing fees, service of process fees, deposition costs, expert witness fees, and other litigation expenses.

## J. Further Relief

For such other and further relief as the Court deems just and proper, including any equitable relief necessary to remedy the harm caused by Defendants' conduct and to prevent future harm to Plaintiffs.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

Respectfully Submitted this 5th day of May, 2026.

By: Ryan T. Earl, Esq.
Ryan T. Earl, #45910
Earl & Earl PPLC
4565 Hilton Parkway, Ste. 228
Colorado Springs, CO 80907
Phone: 719-900-2500
ryan@earlandearl.com
*Attorneys for Plaintiffs Unified Growth, Inc., Gonzy*
*Limited, Ad Depot LLC, and Danelle Osborne*
